## UNITED STATES v. AMERICAN CAN CO.
### No. 26345–H.

United States District Court
N. D. California, S. D.
Nov. 10, 1949.

Herbert A. Bergson, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., San Francisco, Cal., William C. Dixon, Sp. Asst. to the Atty. Gen., Wallace Howland, Sp. Asst. to the Atty. Gen., George W. Jansen, trial attorney, San Francisco, Cal., Lyle L. Jones, Arthur H. Tibbits, William R. Mills, Attorneys, San Francisco, Cal., for plaintiff.

Frederick M. Fisk, W. Burleigh Pattee, San Francisco, Cal. (Simpson Thacher & Bartlett, Whitney North Seymour, Fifield Workum, Douglas A. Calkins, Armand F. MacManus, Chester C. Davis, David S. Junker, Richard Hawkins, Thomas Thacher, Sydney A. Woodd-Cahusac, Alexander R. Ormond, New York City, Chickering & Gregory, San Francisco, Cal., of Counsel), for defendant.

HARRIS, District Judge.

This action was instituted by the government under the Sherman Act,[1] Sections 1 and 2, 15 U.S.C.A. §§ 1, 2, and the Clayton Act,[2] Section 3, 15 U.S.C.A. § 14, seeking to enjoin the American Can Company from unlawful practices, allegedly in violation of both acts. The primary question for determination is whether defendant's requirements contracts and closing machine leases are illegal in the particulars specified.

The pleadings are elaborate as is usual in this type of case. The original complaint was amended shortly prior to trial and issue was joined by the defendant. It would seem unnecessary at this time to give extensive attention to either the pleadings or the detailed pre-trial technique, for the pattern is to a large extent identical in anti-trust litigation.

The facts are not in serious dispute save with respect to a conspiracy charged against American Can Company and Continental Can Company, hereinafter referred to as American and Continental, respectively, for purposes of brevity. The alleged conspiracy will be dealt with at a later stage in this opinion.

Historically the proceeding is not novel. In 1916 Judge John C. Rose, in U. S. v. American Can Company, D. C., 230 F. 859, after an extended hearing under the Sherman Act, Sections 1 and 2, and after finding a monopoly to exist concluded: although American Can Company was designed as a monopoly, dissolution should not be ordered as it is too drastic a remedy.[3]

In 1924 the matter was heard before the Federal Trade Commission.[4] The result of this extensive hearing was that American Can Company consented to remove a tying provision from its closing machine leases.[5]

Today for a third time, the Government has instituted proceedings against defendant under the anti-trust laws. A brief statement of the instant case should suffice at this juncture:

Plaintiff attacks defendant's contracts under which it sells its metal and fiber containers; plaintiff also challenges the legality of defendant's closing machine leases under which it lets its can closing machines which complete the metal and fiber containers. Plaintiff contends that the can contracts and closing machine leases con-

---

1. Commenced under Section 4 of Title 15 U.S.C.A. to enforce Sections 1 and 2.

2. Commenced under Section 25 of Title 15 U.S.C.A. to enforce Section 3.

3. With reference to this initial action against American, the Government claims that it won a lawsuit but lost a cause.

4. Federal Trade Commission Docket No. 123.

5. American Can Company contends that it has lived up to the assurance given to the Commission and that the offensive provision contained in the leases has not been resorted to either expressly or otherwise in its practices and conduct with the consumer-user.

stitute unreasonable restraints of trade and commerce and, in addition, that such contracts and leases, together with certain specified devices, means, methods which will be discussed below, constitute a violation of Section 3 of the Clayton Act.[6] Plaintiff further contends that defendant's contracts and closing machine leases constitute a mode of operation which gives rise to an attempt to monopolize trade and commerce and has effectuated such a monopoly in certain parts of the trade and commerce in canning, in violation of Sections 1 and 2 of the Sherman Act.

Since the conclusion of the trial of the instant case, the Supreme Court has decided Standard Oil Co. v. U. S., 337 U.S. 293, 69 S.Ct. 1051, rehearing denied, October 10, 1949. Plaintiff contends that this case, together with International Salt Co., Inc., v. U. S., 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, is fully and finally determinative of the issue under Section 3 of the Clayton Act and that, as a matter of law under the undisputed facts, judgment must go in its favor; that is, the requirements contracts are illegal and that the closing machine leases are equally offensive and must be stricken down by the Court.

The ultimate remedy sought by the Government is sweeping: it asks for elimination of requirements contracts and complete divestiture of the closing machine phase of the business. In connection with the requirements contracts, American contends that, if the relief sought is granted, the user-customers will be relegated to an uncertain mode of supply and demand not based upon contracts giving rise to enforceable obligations.

Before the Court attempts to analyze the defendant's contracts and leases in terms of current case law, with specific reference to the two recent decisions of International Salt Co., Inc., v. U. S., 332 U. S. 392, 68 S.Ct. 12, supra, and Standard Oil Company of California v. U. S., 337 U.S. 293, 69 S. Ct. 1051, supra,[7] it will review the facts briefly, pertaining to defendant's business.

Incorporated in New Jersey in 1902, defendant has long been foremost in the can manufacturing business of the United States. At its inception, American was the leader in the canmaking business of the United States by reason of its purchase of the large canmaking plants in the country. According to the record in the first antitrust suit instituted against defendant, U. S. v. American Can Co., D.C., 230 F. 859, supra, defendant acquired sufficient plants to enable it to make ninety per cent of the cans used in the country.

At the time of the trial in 1913, American then consumed approximately one-third of the total tin plate used for domestic consumption in the can manufacturing business in the United States. It will be seen, by subsequent review of the facts, that defendant has more than maintained its position in the industry. Thus, in 1913, of approximately 100 million dollars of total can sales, American had business of 32 million dollars. In 1946, when the plaintiff commenced its suit against defendant, American manufactured more than 200 million dollars worth of cans out of a total tin plate worth upwards of 500 million dollars. On the basis of tin plate consumed, American's percentage of the whole was somewhat in excess of 40 per cent.

6. "Sec. 3. It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condi- tion, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

7. See also decision of District Court in 78 F.Supp. 850.

Viewed from the standpoint of competitive sales as against total output of cans, American's percentage is even more impressive. Some canning concerns manufacture their own cans and are thus not in the buying market. Among the can manufacturers who sell on a competitive basis, the total received for cans in 1946 was $433,621,729. American's percentage of the total was 46.4 per cent.[8]

What does the evidence disclose as to the business conducted by American's competitors? It shows that of not more than 125 manufacturers of cans, up to 25 make tin containers for their own use; of the competitive can companies only five manufacture what are known as packers' and general line cans.[9]

American and Continental in 1946 together manufactured approximately 70 per cent of the cans produced in the industry and approximately 80 per cent of all cans made for sale. These figures may be raised to 81 per cent and 93.6 per cent, respectively, if the output of four additional companies—Crown, National, Heekin, and Pacific—is added. Their combined sales of both kinds of cans that year totaled approximately 461 million dollars. Their combined sales of general line cans in the amount of $151,736,000 was equivalent to approximately 66.9 per cent of all cans made and 81 per cent of all made for sale. In this group of six companies in 1946, American accounted for 47.9 per cent of the sanitary cans and 52.2 per cent of the general line cans. American and Continental together sold 86.1 per cent of all the cans made.

Thus we see that the canmaking industry is concentrated in a handful of companies and that American achieves dominant stature among this handful with an output of 49 per cent of all cans made by the group in 1946.

By graphical representation and statistical supporting data, the trial record is convincing, clear, and complete, that the defendant's domination of the industry has grown over the intervening years; that Continental and American manufacture about 80 per cent of all cans made for sale; that there are six companies in the United States, making both packers' and general line cans, and they manufacture 93.6 per cent of all cans made for sale.

Viewed from the standpoint of growth, American's position continues to be im-

---

8. Ex. 3124 and stipulation, November 24, 1948, para. 3b.

9. "On January 27, 1943, there were only 214 tin container plants in the United States. At the present time the tin container industry is composed of not more than 125 manufacturers, and not more than 25 of that number manufacture solely for their own use. (See Pretrial Order filed December 9, 1948, para. 10(d), (e) ).

"In 1904, the tin container industry's output was valued at approximately $68,-000,000 to $76,000,000. By 1937, the production totaled approximately $350,-000,000, and by 1945, approximately $455,000,000. (See Pre-trial Order, filed December 9, 1948, par. 19(c) ).

"Production exceeded $500,000,000 in 1946, the year this action was commenced. At that time, of those who used substantially all of the tin plate which was cut up, there were only 90 can makers. Of these, 58 were making cans exclusively for sale, 7 for sale and their own use, and 25 exclusively for their own use. (See Ex. 3124, at pp. 1, 2.) Obviously, many of the can makers who came into being in the first decade after the organization of defendant have since passed out of existence notwithstanding the fact that the output of the industry has, since that time, multiplied almost tenfold. It is to be noted that out of 34 can makers specifically mentioned by name as constituting 'competition' of American in the Trial Examiner's Report on the Facts, Federal Trade Commission v. American Can Company (supra, Ex. MMM), only 6 are now in existence, a mortality rate of 82%. (See Table 1.)

"In the industry, the total production of tin cans has increased, from $100 million in 1913 to $500 million in 1946, a *500% increase*, while that of cans manufactured for own use has increased from $30 million in 1913 to $66 million in 1946, slightly more than double. During this same period American's business has grown from $32 million to $201 million, *an increase of 628%*. Defendant has more than kept abreast of the industry—it has outdistanced it (Ex. 3124)." (Gov't Brief, p. 19.)

pressive; because of its size at the outset of the war period defendant's percentage of growth during the war and subsequent thereto has not been as rapid as that of its smaller and aggressive rivals. However, in terms of business realized, American has continued to be the mammoth manufacturer of cans. From 1939 to 1947 the business of the above six companies increased 250 million dollars. American's sales constituted 102 million dollars or 45 per cent of the increased business realized. While a comparatively small canning company, such as Crown, was able to treble its business during the period in question, yet in terms of actual sales American enjoyed Company.

From the above recital of facts, it is clear that from a national standpoint, defendant is the leader in the manufacture of cans, although it has competition in its business and is not in a position of complete monopoly. From a regional standpoint, the story of control is different. Thus, in such an area as Utah, defendant has the only plant which serves the needs of the packers in that state. A similar monopoly exists in Hawaii, while in Alaska defendant has 80 per cent of the can business. As might be expected American is the dominant influence in specific sections of the United States.

Viewed from another standpoint—type of container manufactured—defendant far outdistances its competitors in several lines. For example, in the sale of beer cans, coffee cans, shortening cans, and meat cans, American is the major manufacturer.

The foregoing should suffice to indicate the dominant position of American in the industry.

*With respect to closing machines:*

Since the canning industry progressed from the hole and cap cans, which were used at the turn of the century, to the sanitary or packers' cans which are closed by machines, American has moved into leadership in the manufacture and leasing of closing machines. Today it makes and leases to its customers substantially all of their closing machines. The leasing practice by American is followed by its com-

petitors, with Continental also making its own closing machines for this purpose. The number of independent concerns engaged in the manufacture of closing machines is limited to two—Max Ams Machine Company and The Angelus.

In terms of closing machines leased to canners, American controls 54 per cent of all such machines. In excess of 17,000 closing machines were on lease by the canning industry at the time of commencement of this litigation in 1946. Of this number, American had 9,258 machines. Continental far outdistances other canning concerns with approximately 36 per cent of the total machines on lease. The independent can-closing machine makers are thus limited in their sales to a market of 12 per cent of the closing machine business.

It is the fixed and uniform policy of American to lease rather than sell its closing machines. The only exceptions to this policy arise in the few instances in which American sells machines abroad or sells a few single spindle semi-automatic machines in the Ozarks. Other canmaking concerns follow American's policy. Therefore, the two independent can-closing machine makers, Angelus and Max Ams, have a market limited to the small canmakers, for the ordinary canner will not purchase a can-closing machine as long as he can lease it from his can supplier. An important factor which induces canners to lease their machines has been the low rentals charged for such machines. The defendant admits that low rentals provide an effective "sales tool".

American, over the years, has imposed rentals ranging from the purely nominal to a rate sufficient to pay for the cost of the equipment furnished. Recently defendant standardized its charges so that today they represent an amount equivalent to 8.2 per cent of the original cost or 12 per cent of the depreciated value of the machines. Such a charge approaches a fair standard, but even present rentals are insufficient to cover the complete cost of furnishing and servicing the machines. Other canmakers, on a competitive basis have followed American's policy of imposing low or nominal rentals on their closing machines. Rental

figures appear to have been purely arbitrary, depending upon the exigencies and the desirability of the customers' business.

The present case is not directed toward American in its capacity as manufacturer of closing machines. However, it should be noted that the practice of defendant in leasing at below cost figures has tended to restrict the market for closing machine manufacturers and has limited the number of concerns engaged in this business. The record disclosed that others would engage in the manufacture of closing machines if there were a free market in which sellers might compete on an equal basis with the canmakers who now lease their machines.[10] Of American's canmaking competitors, at least one, namely Pacific Can Company, is willing to lease or sell its closing machines to its customers.

*With respect to the requirements contracts:*

The Government contends that defendant's contracts are the major tool by which it is able to exclude or limit competition in the canning business and, hence, is able to maintain its dominant position. American now has a standard form of contract which the plaintiff chooses to call "total requirements contract". In a practical sense, defendant does enter into such a total requirements contract with most of its customers. Canners, according to the record, prefer to deal with a single can manufacturer in obtaining their products for a single plant. American's 1946 contract permits a customer to purchase a single line of cans or any number of kinds of cans on a requirements basis.[11] In 1945 American did 92 per cent of its business in sanitary cans on this basis. Over the years defendant has handled only minute portions of its sales on an open order basis.

Defendant, in order to show that its requirements are not total, has submitted evidence which discloses that in the last year of business more than 43 million dollars worth of canning products were purchased by its customers from competitive canmakers. Such purchases were made by large canners who own plants in widely separated areas and who deal on a requirements basis with one or more canmakers. In a single plant it is most exceptional for a canner to obtain his cans from two or more sources. The record discloses two instances in which customers used other than American cans in their plants.[12]

Throughout its business life American has entered into requirements contracts of varied duration. These have ranged from three to twenty years. Recently, defendant prepared a standardized contract of uniform length of five years. For various reasons, defendant believes that a contract of such duration best serves the interest of both canner and canmaker.

American offers an attractive discount on quantity purchases. The scale serves as an inducement for canners to purchase all of their needs from a single manufacturer. The discount rate has varied over the years. The discount provisions in the 1946 contract are set forth in Exhibit 3013 at pages 11 and 12. They range from .2 per cent for purchases from $50,000 to $75,000 to a maximum of 3 per cent for purchases in excess of four million dollars. In the 1946 contract, which is applicable to both sanitary and general line cans, requirements contract customers enjoy a price differential in discounts which are not granted to open order customers. Prior to 1946 there was a flat differential of 5 per cent in general line cans which were purchased by requirements contract purchasers as against open order customers.

*The defendant's degree of market control:* The statistical data in this case is voluminous. So that we may appreciate the impact of "bigness" as it relates to the canning industry, we must advert to the earlier remarks of Judge Rose in U. S. v. American Can Company, 230 F. at page 902, supra. The jurist said that American, although conceived in sin was leading a rather unblemished life and that the earlier transgression should be forgiven and forgotten as a result of its benign attitude: "While it had its origin in unlawful acts

10. Tr. 4355 and 4360.

11. Ex. 3013.

12. Tr. 983.

and thereby acquired a power which may be harmful, and the acquisition of which in any event was contrary to the policy of Congress as embodied in the statute, it has for some time past used that power, on the whole, rather for weal than for woe", and in conclusion the Court went on: "A dislike for useless waste and destruction makes one loath to follow the authority which may be understood as requiring the breaking up of defendant's organization, in spite of its proved power for good, albeit with serious possibilities of evil. A like instinct rebels against taking any course which may hereafter involve this or any other tribunal's going again over any part of the ground which in this proceeding has once been covered."

A decree of dissolution was not ordered. The record is available to this and any reviewing court as a composite of historical data reflecting the condition of the industry in early 1916 and prior years.

We start with these short excerpts as indicating the cause of causation. The distinguished and able jurist, after a very painstaking, careful and considerate review of mountains of testimony, hoped and expected that some relief would be found in Congressional enactment; that judicial surgery was not required on his part; that he did not have the tools or implements for such drastic dismemberment of the young giant. In concluding, Judge Rose said, 230 F. at page 904: "It is, of course, not suggested that this court should or could undertake the regulation of defendant's business. Courts have no such power and no fitness for its exercise. * * * It is to be hoped that, before any occasion to act upon the power reserved shall arise, Congress will substitute some other method than dissolution for dealing with the problems which arise when a single corporation absorbs a large part of the country's productive capacity in any one line."

The foregoing excerpts are alluded to as background for the statistical information presented by the Government.

The information, data, and computations are better understood in the light of those picturesque and detailed accounts, given by Judge Rose, of the young giant's formative years.

Such is the history, as the record discloses it, of the genesis of the defendant, such the story of its organization and of its conduct during the first years of its existence. It is clear an attempt was made both to restrain and monopolize the interstate trade in tin cans.

■ *The closing machine Leases executed by customers with the defendant are violative of Section 3 of the Clayton Act:*

In the light of Standard Oil Company v. United States, 337 U.S. 293, 69 S.Ct. 1051, supra, this phase of the case is reduced to comparative simplicity. In reaching the conclusion that the leasing practices must be proscribed, we must trace briefly the practices of American since the "tying provision" was admittedly removed from the lease contracts covering closing machines.

In May 1917, in the course of an investigation of American by the Federal Trade Commission, the defendant agreed to eliminate from its forms of contract and lease any clauses which the Commission considered objectionable. Defendant now asserts that it struck the offending "tying clause" from its leases in the latter part of 1917, and, that since the elimination of the clause, the provisions in the contract for the lease of closing machines has remained substantially identical, embodying the usual covenants customarily found in lease contracts.

Paragraph two, containing the "tying provision" read: "Lessee agrees that it will pay the rental as above provided, and that it will not use or permit the user of any of said machines or additional equipment, if any, for any purpose except therewith to close cans which the lessee shall have bought from the lessor and will not, directly or indirectly, use or permit the use of, the same except as herein expressly authorized."

The Government contends that the provision, although eliminated from the lease forms, has been kept alive and in effect as a result of the practices engaged in by American of a "subtle and refined" char-

acter. The practices, in substance, are as follows:

Defendant leases closing machines only to customers who purchase their cans from it, and closing machine leases run for terms concurrent with the can contracts. Sales policies, as contained in memoranda and directives from the executive officers, bear out the Government's contentions that the "tying provision" for all practical purposes has remained in the contract negotiations. The evidence introduced by the Government in this connection abundantly supports this contention and no useful purpose could be served herein by lengthy excerpts from the record.[13]

Defendant asserts that "unless the lessee, as a condition of his closing machinery lease, is obligated to buy from the defendant all the containers he closes on that machine, the Clayton Act has no application". That is precisely what American achieves as a matter of over-all policy!

Several illustrations from the record should suffice: In the case of Hunt Brothers Packing, in 1943, the term of closing machine leases extended beyond the expiration date of its requirements contract with American, or at least the rental invoices on the machines which had been paid by the customer extended beyond the contract period. Hunt Brothers contracted to buy cans from Continental to begin at the expiration date of the American contract. But prior to the expiration date of the closing machine leases or rental invoice periods, the defendant, through its officers, responded to Hunt Brothers' notification of change of can supplier in the following manner: "We were rather fearful that the customer would insist on keeping our machinery and using it to close Continental cans which he probably legally could inasmuch as the rental invoices specifically mention the expiration dates which were beyond the expiration date of its lease. In order to avoid any possibility of having the customer use our equipment to close competitors' cans, Mr. Sullivan (then defendant's Pacific Coast Vice-President) agreed to refund all unearned rentals. (Ex. 33.) And in another transaction the General Sales Department said: "As you have suggested, it would be advisable to tie the sale of machinery with a can contract as we have done with Grey International Corporation." (Ex. 670.)

The general intent and purpose expressed are unmistakable; this appears from the foregoing several excerpts as well as from additional documents in evidence. Defendant's witnesses from the ex-

---

13. As illustrative, see Ex. 1A and 1. Of particular significance is the following excerpt from Ex. 1A: "We have the legal right to lease closing machines to anyone that we please, and we may refuse to rent a closing machine to anyone that we please, without assigning any reason for it * * *. We may rent closing machines to customers who have term contracts with us for the purchase of cans, and we are at liberty to make the term of the lease the same as the term of the can contract, but there must not be any clause either in the lease or in the can contract that makes either one of them dependent on the other * * *. If a customer wishes to be released from the obligation of his contract to purchase cans, we may require as a *condition* of our consent to the termination that the lease of his closing machine shall be terminated at the same time. We are not obligated to consent to the termination of the can contract, and we may require any *condition* that we think reasonable, for giving our consent. If a customer's can contract contains a provision giving him the option to terminate it at a specified date or dates, *there must not be any provision in the lease* of closing machines providing that it shall terminate in case the can contract is terminated by the customer; *but*, of course, it is perfectly permissible that the lease should contain a provision giving the American Can Company the right to terminate the lease and recall the machine on any specified date or dates, and this date or dates may be made the same as the dates specified in the can contract for termination of that contract by the customer. When our salesman is negotiating a can contract with a prospective customer, it is entirely unobjectionable for the salesman to *tell the customer that if he will sign a contract to buy cans from us, we will lease him a closing machine or machines.*"

ecutive branch expressed dismay over the use of such "unfortunate language" and sought to explain away the written word by "general characterizations" and "ill-advised thinking" on the part of members of the defendant organization. Notwith-standing these fluent and persuasive witnesses, the Court is inclined to view the written record as disclosing a pattern as to policy, pointing unerringly to the conclusion that, in the main, American would not lease closing machines without a corresponding sale of cans.[14]

That the closing machines represent a most valuable sales tool becomes increasingly manifest when it is considered that defendant has in excess of 9,000 machines on lease of an approximate value of 12 million dollars, many of which have been rented at nominal or low rental values in order to foreclose competition. The evidence herein discloses that American owns and controls more closing machines than the rest of the industry together, and demonstrates that defendant effectively ties the leasing of such machines to the sales of its cans. Defendant owns approximately 54 per cent of all closing machines available for lease to the industry.

It may be noted that the closing machines manufactured by American, with slight adjustment, may be used to close the cans of the other can manufacturers; that there are no basic patent rights involved as was the case in the International Salt controversy, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, supra.

Finally, American contends that "in the absence of proof of the alleged condition, agreement or understanding not to use the goods of a competitor, and a proof that any such understanding may substantially lessen competition or tend to create a monopoly the Clayton Act has not been violated".

As a matter of law, this contention is set at rest by Standard Oil Company v. United States, 337 U.S. 293, 69 S.Ct. 1051, supra. Section 3 of the Clayton Act is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected.

It is manifest to this Court from the record herein that abundant proof has been supplied by the Government, and the Court accordingly finds that the leasing practices of can closing machines violate the said Act for they affect injuriously a sizable part of interstate commerce, i. e., an appreciable segment of interstate commerce.

*The devices, means and methods used by defendant in accomplishing the monopoly:*

Much of the trial, which consumed approximately 117 days and embraced more than 7,000 pages of testimony, concerned the Government's charge that for years American has, by various devices, means and methods, persuaded and induced canners to enter into the requirements contracts. Defendant describes this conduct in many instances as "commercial massage"; the Government counsel refers to the same as "commercial bribery" and other inelegant terms of comparable import.

Suffice it to say, that no useful purpose could be served by recounting herein the details of all the transactions spread over a period of years from 1930. They represent a saga of American business—so-called "big business". Taken alone, or disassociated from the general configuration[15] or picture, many of the transactions would appear to be without probative value. However, as a composite they set a pattern of operations evidencing the extremes defendant saw fit to go in perpetuating the contractual relationship between defendant and the customer-user.[16] The devices took many forms: defendant pro-

14. See U. S. v. Corn Products Refining Co., D.C., 234 F. 964, 978, wherein Judge Learned Hand said: "The documents were never intended to meet the eyes of any one but the officers themselves, and were, as it were, cinematographic photographs of their purposes at the time when they were written. They have, therefore, the highest validity as evidence of intention * * *."

15. See U. S. v. Standard Oil, 78 F.Supp. at page 864, supra.

16. Cf. U. S. v. Pullman Co., 50 F.Supp. 123, 136.

vided discounts in ancillary contracts; defendant paid large sums of money to obtain business of its customers; defendant furnished equipment, in addition to closing machines, at nominal rentals; defendant paid large claims when it appeared propitious and good policy; defendant purchased canmaking equipment from its customers for inflated values in order to obtain can business. The foregoing represent only part of the claims set up by the Government under the "inducements" phase of the case. Several transactions will serve to illustrate:

In 1930 defendant paid Van Camp Packing Company, Inc. $50,000 to obtain their general line business for a period of four years, beginning January 1, 1930. "The basis of the payment referred to was the offer of Van Camp Packing Company, Inc. to sign a contract with defendant instead of with a competitor for its requirements of general line cans for four years". [17]

American paid Hawaiian Pineapple $50,000 "as an inducement to secure * * * five years additional business".

On December 8, 1936, American paid California Packing Corporation $2,335,000 in settlement of a variety of claims for packaging allowances, freight overcharges, discounts allowed Cal-Pack's competitors and credit arrangements extended to Cal-Pack's competitors. This claim remained disputed and unpaid for a long period of time. Finally, the claim was paid—coincident with the execution of new contracts to cover Cal-Pack's requirements for all its packing plants.

Defendant was willing to furnish 17 prevacuumizing lines for Libby, McNeil & Libby which would cost between $650,000 and $700,000 and rent between $25,000 and $30,000 per year; this, upon the basis that "full requirements contracts" be entered into.

Interesting also are the Richmond Chase, Pratt-Low Preserving and the Hovden Food Products financial transactions. They indicate the extreme measures undertaken by defendant to acquire and retain customers. [18]

Defendant, in responding to the Government's contention that these transactions and incidents [19] must be taken as part of the general configuration in interpreting the effect of the requirements contracts and the closing machine leases, says in part: "Certainly there is no evidence in this record that these 'inducements' were conditioned on the signing of a requirements contract".

To the contrary there is evidence in the record, and inferences to be drawn therefrom, that the inducements referred to, in many instances, formed an important and vital part in the renewal or re-negotiation of requirements contracts.

Certain practices, as defendant claims, represent no more nor less than "ordinary business practices, such as the extension of credit, the servicing of leased machinery, the equalization of freight rates and similar activities one would expect to find in any industry in which competitors are seeking to serve the needs of their customers and keep their good will".

The incidents, when examined realistically and not as mere abstractions, are deeper than the typical run-of-the-mill, day-to-day business transactions. They represent a studied, methodical and effective method of retaining and acquiring by refined, gentlemanly and suave means, plus an occasional "commercial massage", the dominant position which American has had and maintained for at least a generation on and over the canning industry. A detailed analysis of this phase of the Government's case convinces that there is little room left in a competitive sense, for the independent small business man. As a competitive influence, he has slowly and sadly been relegated into the limbo of American enterprise.

■ *The evidence establishes violations of Sections 1 and 2 of the Sherman Act:*

17. Tr. 1202–3.

18. Tr. 1284–; 2098–2104; 1961–3, 1972.

19. Plaintiff's brief, pp. 120–163.

The proof in this case compels the conclusion that the five year requirements contracts and closing machine leases unreasonably restrain trade in violation of the Sherman Act. The evidence discloses that competitors have been foreclosed from a substantial market by the contracts and leases.

The practices surrounding the leasing of closing machines, in view of Section 3 of the Clayton Act, have received appropriate treatment and discussion, supra; although the "tying provision" has ostensibly been deleted from the leases, nevertheless, as a matter of practice and policy, the machines are still "tied" to the sale of cans.

Add to the foregoing element the requirements contract:

The form of contract finally promulgated by the defendant in 1946 is, in practical effect, a total requirements contract. It covers the sale by the supplier and the purchase by the user of all of the containers specified in the contract which the user shall require for his actual use in his operations in all specified points in the United States and its possessions and territories.[20]

From a realistic view the 1946 contract with its schedules covers all of the requirements of the customer in every conceivable type of container used by him and manufactured by American, whether it be a sanitary or general line can, a fruit or vegetable or coffee can, or fibre container.

As distinguished from the contracts of prior years this agreement as finally evolved provides for a term of five years. It may be remembered that American's requirements contracts in years past extended over periods far in excess of five years; sometimes as high as ten, fifteen, or even twenty years, depending upon conditions and circumstances which, in the defendant's opinion, justified such long periods.

The instant agreement embodies a pricing formula, as well as discount privileges.[21] The force and effect of the elaborate discount plan may be perceived in the light of the sales record.[22]

As demonstrative of the control and domination exercised by American in and over the industry, we have referred to statistical information which stands uncontradicted.[23]

With the premise established that American is in a dominant role and a position of preeminent power in the industry, we may then examine the record to determine whether: (a) competition has been foreclosed; (b) from any substantial market. In U. S. v. Standard Oil Company, 78 F. Supp. at page 872, supra, Judge Yankwich said in part: *"In effect, it amounts to a substantial lessening of competition and a monopoly of a sizeable segment of a line of commerce in a definite area—the seven Western states. What has the tendency to achieve such result becomes, in actual effect, an unreasonable restraint. \* \* \*"* (Italics ours.)

In the instant case the Government's proof shows the use by defendant of approximately 4,000 requirements contracts involving 250 million dollars in business annually, and a domination in the canmaking industry for a period of almost 50 years. The evidence reveals the ownership and control of more closing machines than the rest of the industry as a whole, and it further demonstrates that defendant effectively ties in the leasing of the closing machines with the sale of cans under requirements contracts. Thus, Government argues that domination and control having been demonstrated, this Court must hold as a matter of law, in the light of the contracts entered into and the business controlled under the contracts, implemented with the devices, means and methods already alluded to, that competition is foreclosed over a period of many years with respect to a sizeable segment of the canmaking business, to wit, approximately 40 per cent.

In short, it is contended that from the foregoing an *automatic* result follows and

20. Ex. 3013, supra.
21. Ex. 3013, supra.

22. Ex. 4811.
23. Exs. 3124, 3125, 3126, UU.

that where competition under such circumstances is excluded, that the restraint and monopolistic practices are unreasonable.

Defendant contends that traditionally, in view of practices surrounding requirements contracts, this Court must undertake a comparative analysis in determining the merit or de-merit of such contracts; whether they are apt in their use in this particular industry; whether they are favored by the user-consumer, etc.[24]

The Supreme Court has held such evidence immaterial and has stated that "serious difficulties would attend the attempt to apply these tests", in concluding a violation with respect to requirements contracts under Section 3 of the Clayton Act, Standard Oil Company v. U. S., supra, 337 U.S. at page 308, 69 S.Ct. at page 1059; the trial court, however, held that such evidence might well have a bearing upon the issues although not determinative under the Sherman Act:

"Over the Government's objection, I allowed many comparative statistics * * * to go into the record. This was consistent with the view that in resolving the issues of this case, the potentional or actual effect of the agreements is important in determining unreasonableness of restraint under the Sherman Act and substantiality of restraint or tendency to create monopoly under the Clayton Act.

"*But, while the comparative figures bear on the question, they are not determinate.* Substantiality of restraint or tendency to create monopoly is established by (a) the market foreclosed,—here represented by the controlled units,—and (b) the volume of controlled business, totalling here in value $68,000,000.

"Fractionally speaking, the business done by the competitors with their own outlets or with those under contract is much greater than the business of Standard,—both in volume and in money value. Nevertheless, the business of Standard is considerable.

In effect, it amounts to a substantial lessening of competition and a monopoly of a sizeable segment of a line of commerce in a definite area—the seven Western states. What has the tendency to achieve such result becomes, in actual effect, an unreasonable restraint." 78 F.Supp. at page 872. (Italics ours.)

Apart from the inevitable conclusion reached that the requirements contracts and closing machine leases, backgrounded by the configuration of the devices and practices, offend against the Sherman Act, Sections 1 and 2 thereof, there is the problem of the user-consumer which must be approached not as a legal abstraction, but realistically. He should not be left without a source of supply. The canners are subject in many instances to the whims of nature over which they have no control. They are, therefore, required to have available a supply of tin containers, fluid in amount, and appropriate from the technological and marketing viewpoints. The general reason assigned for requirements contracts was that canners wished to be assured of receiving containers when, as, and if needed, regardless of any contingency which might affect the raw material supply or the market.

During the course of the trial the question was posed in several instances whether the term of the contracts under consideration was reasonable or unreasonable in the light of the five year period. The Government was not willing to declare its position as to when the duration of such a contract became so long as to be unreasonable.

In its brief (page 217), the Government takes the position that, by reason of the impingement of the machinery lease contracts upon the requirements contract the term of the requirements contract, be it fifteen years, ten years, five years or one day is immaterial. That the term requirements contracts perforce must be stricken as a whole. The basic answer to this con-

24. Associated Press v. U. S., 326 U.S. 1, 23, 65 S.Ct. 1416, 89 L.Ed. 2013; Pick Mfg. Company v. General Motors Corp., 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4; Federal Trade Comm. v. Sinclair Refining Company, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

tention is brief: The Government has intertwined the lease contracts with the requirements contract without giving recognition to the separate status of each. Although admittedly the machinery lease contract impinges upon the requirements contract, nevertheless, the inherent vitality or lack of vitality is not to be determined from that circumstance alone. Rather the question of reasonableness must to some degree be determined by the force and effect of the contract upon trade and commerce, and, when we take the requirements contract in and of itself and examine it in the light of its possible effect upon trade and commerce, it must be concluded that the *five year* term creates an unreasonable restraint in the light of all the facts, factors, circumstances and background.

In finding the five year requirements contract illegal, we are not thereby compelled to declare void any and all requirements contracts. We *cannot* ignore the testimony of countless witnesses who indicated the vital necessity of some sort of supply contract. Several of them, of course, vigorously denounced the long-term period. Others believed emphatically in a term not to exceed one year for, as it was pointed out, at the expiration date of such a period of time they could cast about in the open market.

■ Mindful that requirements contracts are not per se unlawful,[25] and that one of the elements which should be considered is the length thereof, it is only fair to conclude after a careful review of the evidence, that a contract for a period of one year would permit competitive influences to operate at the expiration of said period of time, and the vice which is now present in the five year requirements contracts, would be removed. Under a contract limited to one year, the user-consumer would be guaranteed an assured supply and protected by

a definite obligation on the part of American to meet the totality of needs of the canner, while he, in turn, would have a fixed obligation to purchase his seasonal needs from American, thus making for mutuality of contract and obligation.

To strike down the requirements contracts and to declare them totally void as violative of the Sherman Act, without at the same time affording to the user-consumer a supply over a limited period of time, would be destructive, illogical, unsound and not in consonance with the acute and particular problems confronting the canning industry.

■ The trial court in the Standard Oil case expresses what we believe to be the rational concept under the Sherman Act[26] in determining whether a requirements contract of five years is reasonable or unreasonable and the actual or potential effect of such agreement: "(The contract) becomes illegal only if it result in a substantial lessening of competition or the creation of monopoly in the line of commerce". 78 F.Supp. at page 863.

■ In analyzing a contract in terms of its effect on competition, the condition of the consumer should not be completely ignored, although, as it appears, the wishes or desires of the consumer are not determinative in reaching a finding as to whether a monopoly or a tendency to create a monopoly exists.

As the trial court pointed out in U. S. v. Standard Oil, supra, 78 F.Supp. at page 872: " * * * While the comparative figures bear on the question, they are not determinate", and then the Court went on to find that " * * * restraint or tendency to create monopoly is established by (a) the market foreclosed,—here represented by the controlled units,—and (b)

---

25. See U. S. v. Standard Oil Co., 78 F.Supp. at page 877, supra; Nash v. U. S., 229 U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232; Appalachian Coals, Inc., v. U. S., 288 U.S. 344, 361, 53 S.Ct. 471, 77 L.Ed. 825; Standard Oil Co. v. Federal Trade Comm., 3 Cir., 282 F. 81, affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

26. Mr. Justice Frankfurter in Standard Oil Co. v. U. S., 337 U.S. at page 314, 69 S.Ct. at page 1062, concluded: "Since the decree below is sustained by our interpretation of § 3 of the Clayton Act, we need not go on to consider whether it might also be sustained by § 1 of the Sherman Act."

the volume of controlled business, totalling here in value $68,000,000."

It is manifest, from the said opinion, that the question of "reasonableness" was still in the case. The trial court concluded, however, that the other factors, as indicated, were controlling and that the evidence with respect to comparative figures, and whether the contracts were apt, etc., although having a bearing on the controversy, were not persuasive. Judge Yankwich refused an argument by the Government that the requirements contracts were illegal per se under either the Clayton Act or Sherman Act, and held in effect that the "reasonableness" or "unreasonableness" of the restraint should be considered as questions of fact, the solution of which rests upon the condition obtaining in *each particular case.* 78 F.Supp. at pages 857, 863, 877.[27]

The Court must weigh a one year requirements contract and its important role in the business of the consumer-user, as against a mode of operation without contractual assurance to protect the small canner.

In this *particular case* we have concluded that the Court is not foreclosed from an examination into the needs and requirements of the industry with respect to a finding as to whether an unreasonable restraint and monopoly exist under Sections 1 and 2 of the Sherman Act. The requirements of the industry in our opinion have a bearing upon the problem herein although admittedly not finally determinative of the ultimate question to be resolved.

We find, therefore, that, in the light of the evidence, the requirements contracts herein are unreasonable for the period or duration of five years and that a reasonable period of time for said duration is one year.

■ The Government contends that the requirements contracts also offend against Section 3 of the Clayton Act. From a review of the record, the Court perceived that these contracts properly fall within the proscription of Sections 1 and 2 of the Sherman Act and that their provisions must be dealt with accordingly. Defendant's requirements contracts do not come within either the language or the intent of Section 3 of the Clayton Act.[28]

*The agreement to fix prices between American and Continental:*

Prior to trial, plaintiff moved to consolidate this cause with that of a similar anti-trust suit now pending between U. S. of America and Continental Can Company. After lengthy argument by counsel, the Court denied the motion. It was contended then, as it is now, that the practices, devices, and general pattern of operation of Continental are identical in practically all respects with those of American.[29]

Neither the complaint filed in August, 1946, nor the amended complaint on which this case was tried contains any allegation or charge of conspiracy. The amended complaint in paragraph 10(i) alleges that defendant, through various devices, induced and required its customers to purchase from it their total requirements of metal and fibre containers, or specified kinds or types thereof. Responding to defendant's interrogatories, plaintiff on August 2, 1948, enumerated some 19 of such claimed devices. By a supplemental answer, served September 21, 1948, plaintiff

27. See also 337 U.S. 319, 69 S.Ct. at page 1066, supra: "Whether it is a substantial lessening of competition within the meaning of the Anti–Trust Laws is a question of degree and may vary from industry to industry."

Mr. Justice Douglas, in this dissent, was critical of the majority ruling with respect to applicability of Section 3 of the Clayton Act to the requirements contracts in question. The following language by the Justice is especially pertinent in considering such requirements contracts in terms of the Sherman Act:

"* * * The effect which it (the requirements contract) has on competition in this field is minor as compared to the damage which will flow from the judicially approved formula for the growth of bigness tendered by the Court as an alternative. Our choice must be made on the basis not of abstractions but of the realities of modern industrial life." 337 U.S. at page 320, 69 S.Ct. at page 1067, supra.

28. Defendant's Brief, pp. 96, 97, et seq.

29. Gov't Brief, p. 209 et seq.

for the first time set forth that among such devices were agreements of American with Continental, all of which had more than two years previously been set forth in an indictment returned by a Grand Jury of this District. The criminal indictment charged conspiracy between American and Continental as to price fixing, etc.[30]

This background has been provided so that the full import of the so-called conspiracy aspect of this case may be appreciated.

 Apart from any claimed conspiracy, there is abundant evidence with respect to the agreement or agreements on the part of the officers of Continental and American to fix prices. This evidence goes far beyond that referred to by Judge Rose in 1916 when he said [230 F. 892]: "* * * There is no question that since 1901 the defendant has very largely fixed the price at which packers' cans have been sold throughout the United States. It has competitors who now sell approximately one-half the cans which are sold in the country. There is no evidence of any price agreement between it and them. There is no reason to think that there

is on this subject any understanding of any kind, however vague or indefinite. * * *" The pattern of evidence herein suggests more than a following on the part of Continental of the prices fixed and established by American.

Mr. Justice Douglas in Standard Oil Co. v. U. S., 337 U.S. at page 318, 69 S.Ct. at page 1066, supra, referred to "monopoly competition". His language has a direct and persuasive bearing upon the problem at hand: "* * * The increased concentration of industrial power in the hands of a few has changed habits of thought. A new age has been introduced. It is more and more an age of 'monopoly competition.' Monopoly competition is a regime of friendly alliances, of quick and easy accommodation of prices even without the benefit of trade associations, of what Brandeis said was euphemistically called 'cooperation.' While this is not true in all fields, it has become alarmingly apparent in many."

 Much of the evidence elicited in support of the so-called conspiracy had to do with intra-mural activities concerning Continental [31] and was without any bear-

---

30. The Government sought to introduce in the instant case, American's plea of nolo contendere, upon the ground that the judgment rendered in the criminal action was res adjudicata. The objection of defendant, American Can Company to such offer was sustained. (Tr. 1160.)

31. The Court received this testimony upon the theory that the Government was attempting to establish *intent* on the part of the defendant:

"Without committing the court to a definite policy, as the evidence unfolds, it is my considered judgment and opinion that evidence of an agreement between the officers of Continental and the American Can Company with respect to the division of territory, fixing of prices, and the like, will be admissible in this case, not to prove or tend to prove a conspiracy existing between American and Continental, but rather, at least in part, going to the matter of intent. * * *

"To be sure, the acts and declarations of Continental, as I indicated before in my earlier views, would not be binding upon American, nor the acts and declarations of American binding upon Con-

tinental, nor is the evidence offered and adduced, or proffered to the court intended to prove a conspiracy, but, rather, I should admit it solely for the reason that I believe such acts and conduct will tend to give this court a definite view of intent with which American Can Company performed certain acts. * * *

"I say in this case, as I view the offer suggested by Mr. Jansen yesterday afternoon, knowledge of intent will certainly aid this court in interpreting facts. Thus far, certain of the testimony and the documents offered in evidence may reflect ordinary routine transactions disassociated from the full conduct and the full pattern of operations when viewed, as Mr. Jansen would have us believe, in configuration. I think it will aid this court measurably to determine on this evidence one way or the other intent of the American Can Company, acting through its officers and agents.

"It is upon that theory, and only upon that theory, the evidence is admissible. I shall indicate to you, however, Mr. Jansen, that, as your evidence unfolds, I shall rule in the light of any objection made, and I shall permit you in no way

ing upon the precise issues involved in this case; the Court has ignored all such evidence in the findings herein.[32] In this connection the testimony and exhibits have been disregarded, save with respect to such evidence which bears upon the relationship of the officers and executives of both companies concerning the fixing of prices.

It becomes unnecessary, under the issues as framed in this case, to make any finding with respect to a so-called conspiracy or to otherwise allude thereto. The conspiracy, or its absence, cannot serve as a premise in any logical reasoning leading to a conclusion with respect to the practices that are at issue. However, we do find that American and Continental, through their officers, agents, and servants, did directly agree to fix prices. This is manifest from the evidence, as well as the pattern of the price lists which appeared in the exhibits.[33]

*Affirmative defenses of American Can Company:*

The affirmative defenses set up by American have been either expressly or impliedly denied by the Court during the trial of the case. Defendant has alleged, first, that the issues raised by the complaint are res judicata by reason of the judgment in U. S. v. American Can Co., D.C., 230 F. 859; Id., D.C., 234 F. 1019. The Court has previously indicated that this asserted defense is unavailing and defendant itself has acquiesced in the Court's ruling by asserting that it would prefer a decision on the merits rather than rely upon a technical assertion.[34] But defendant expressed

such a desire "without waiving the defense", submitting that, at the very least, Judge Rose's decision should be considered a most persuasive precedent.

■ Defendant has alleged as a second affirmative defense: that the leases and total requirements contracts and issues regarding the legality thereof, are moot by reason of the dismissal of the 1924 complaint by the Federal Trade Commission.[35] The decision or determination of the Commission is not binding upon this Court under the issues raised herein.

This brings us then to the remedies sought by the Government:

*The remedies sought by the Government:*

The remedies, as embraced in the prayer of the complaint, are substantially as follows:

"(a) That the Court adjudge that the defendant American has violated and is now violating Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. * * *

"(b) That the several contracts between defendant American and its lessees and customers * * * be adjudged to be illegal and that defendant American be ordered to cancel said lease contracts as well as said total requirements contracts and to refrain from enforcing the same.

"(c) That defendant American be perpetually enjoined and restrained from entering into any new or additional leasing contracts * * * with the requirement that the lessee or purchaser purchase all or

---

to depart therefrom, not to go into other matters of internal affairs in Continental, inter-office communications, what Continental's vice president said to one of its officers or attaches. Such would be hearsay as to American. But with respect to the matters of alleged agreements occurring in conferences, as you said, occasionally in San Francisco, or in connection with pacts, agreements, or the like, I shall hear evidence. Is that clear?" (Tr. 1547, 1548, 1549.)

32. 31 Corpus Juris Secundum, Evidence, § 210, page 945: The reason for excluding hearsay "is not present where the evidence is addressed solely to the judge,

to enable him to decide matters of fact, or to determine as to the exercise of discretion, and consequently the rule is considerably relaxed under such circumstances".

33. See Exs. 1437, 1438, 3049.

34. Defendant's Brief, p. 24.

35. 7 F.T.C., supra, decision 541, 1924, p. 128. We have already observed that with respect to the closing machine contracts, American deleted the "tying" provision, that is to say, it effected the physical deletion of the tying language at the instance of the Commission.

any of its metal and fiber containers from defendant American * * *.

"(d) That defendant American, * * * be perpetually enjoined and restrained from leasing or making a sale or contract for the sale of container closing machinery * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the containers or other commodities of a competitor or competitors of defendant American.

"(e) Divestiture of the closing machine part of defendant's business * * * or

"(f) * * * directing defendant to sell or lease its closing machines to any applicant on nondiscriminatory terms and conditions and to provide service for said machines to all lessees on the same terms and conditions." (Govt. Brief, pp. 10, 11, Appendix.)

Defendant claims that the relief sought is drastic and unjustified.[36] The Government claims with equal vigor that the closing machine phase of the business should be divested[37] and that the closing machine leases and requirements contracts should be stricken and declared void. We are satisfied that it will take an additional hearing or several hearings to clarify this case on the sweeping remedies asked by the Government.

The Court's conclusion being that there has been a violation of the Sherman Act as well as the Clayton Act, the final question is one of determining the equitable relief to be had. Counsel for both sides are entitled to be heard with respect to the same, and the ultimate order to be had herein. It may be that additional testimony with respect to certain phases of the case will be helpful in formulating the decree of the Court.

Plaintiff may submit herein Findings of Fact and Conclusions of Law in accordance with the foregoing opinion. With respect to the ultimate remedies or relief, ruling will be deferred until further hearing and upon notice.

36. Defendant's Brief, p. 183 et seq.

37. This would effect in excess of 9,000 closing machines.