**UNITED STATES of America,
Plaintiff,**

v.

**CONTINENTAL CAN COMPANY,
Defendant.**

**No. 26346.**

United States District Court,
N. D. California, S. D.

March 4, 1955.

Dr. Samuel B. Ross, Lyle D. Jones, Special Assts. to the Atty. Gen., for plaintiff.

McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., by Morris M. Doyle, and Gordon M. Weber, San Francisco, Cal., Willkie, Owen, Farr, Gallagher & Walton, by H. Bartow Farr, New York City, for defendant.

HARRIS, District Judge.

Continental Can Company (hereafter referred to as "Continental") has moved the court to amend paragraph (10) of Section III of the Judgment whereby the *compensatory* rental requirement will be changed to a *reasonable* rental requirement for can closing equipment and related equipment.[1]

Pursuant to its motion Continental made a preliminary showing on November 19, 20, 23 and 24, 1953. At that time it presented evidence through its Vice-President in charge of sales, eight canners in the vicinity of California, and the secretary of a canners' association from the middle West. Continental sought to show that under the decree it would be compelled to increase its level of charges for the rental of can closing equipment to a figure of 108% to reach a compensatory level.

Although the testimony at the November hearing was incomplete, the court felt that a *prima facie* showing had been made sufficient to warrant the approval of an order temporarily suspending the operation of the compensatory rental section of the decree until January 1, 1955. At the same time it set down for further hearing in July of 1954 the whole question of compensatory rentals.

On July 20 through July 26 the court took testimony on Continental's request for modification of paragraph (10), III. During this extended hearing the chief witness was Agent Joseph P. Cogan, accountant in the FBI New York office. Mr. Cogan had analyzed the books of both Continental and American Can Companies to ascertain the methods employed by the two corporations in determining their rental levels of can closing equipment. The accuracy of Mr. Cogan's testimony was confirmed by Mr. Barry, chief accounting officer for Continental, and Mr. McNicol, assistant controller for American. Mr. Wojtul, vice president in charge of sales for Continental also testified as to Continental practices and explained why certain procedures were adopted and theories advanced.

---

1. Judgment, United States of America v. Continental Can Company, Inc., No. 26346, N.D.Cal., So.Div. Sec. III, par. (10) Compensatory Rentals. The defendant is hereby ordered and directed for a period of three (3) years from January 1, 1951 to establish and maintain a rental for each type and model of leased container closing machine, related equipment, and auxiliary equipment which shall not be less than reasonable under circumstances from time to time existing, including but not limited to the age, efficiency, and serviceability of such type and model of machine or equipment. *On and after January 1, 1954, defendant is hereby ordered and directed to establish and maintain rentals for leased container closing machines, related equip-* *ment, and auxiliary equipment at compensatory rates which shall take account of, in the aggregate, not less than the expenses incurred by it in the leasing of such machines and equipment, including depreciation thereon, a reasonable return on the current investment after depreciation therein, and the cost of providing services in connection with the leasing of such machines and equipment. In any proceeding brought to enforce this provision the defendant shall bear the burden of establishing that the rentals are in compliance with it.*

This provision had equal application to American Can. No. 26345. United States v. American Can Co., D.C., 87 F. Supp. 18.

In his testimony Mr. Cogan showed that the two corporations differed in certain, basic accounting practices. Continental attempted to forecast and project rental costs and the machine population which would be on lease for the ensuing year. In connection with such forecasts the company would take into account refunds of rentals due because of sales of machines, return of leased equipment and additional income it might enjoy from leasing of more machines which the company would acquire.

In contrast, American made no effort to forecast its costs, or the number of machines that would be on lease in the future.

Continental charged as a rental item, losses incurred in the sales of service on leased equipment. As construed by American, the Judgment did not require such losses on leased equipment to be included in the cost of rental. American treated this item as a basic expense involved in the ultimate sale of the can closing equipment.

When Continental had sold machines on lease it had deducted from rental income refunds it granted as sales incentives. On the other hand, American viewed such rental as an inducement for purchase of the machine and a reduction of the sales price. Thus it had not removed from rental income any reduction in the amount of leased equipment sold.

Continental at the July hearing re-emphasized the fact that certain canners were unable to purchase can closing equipment because of their weak financial position; at the same time these small or marginal canners—whom the Judgment was intended to assist—would be seriously injured by the extraordinarily high rentals projected by Continental.

At the July and November hearings the Government took the position that the number of canners affected by Continental's asserted high rentals was extremely limited. In most instances the small canners whose credit would not permit them to purchase can closing equipment were suffering financial difficulties because of basic economic factors, such as disappearance of fish from their usual waters, or drought, or crop failure. The expense of renting equipment represented a minor item even for these packers, although admittedly it made the difference between loss and perhaps breaking even.[2]

In rebuttal, Continental pointed out the inadequacy of the government's analysis of small packer costs by showing that the accounting data had not been analyzed from the standpoint of capital costs and total costs of operation.

Despite the detailed evidence produced by the parties at the previous hearings on the question of compensatory rental, the court found, upon a review of the record, that it required additional data on certain questions, particularly as bearing upon the canner situated on the Eastern seaboard and Southern States. To this end it arranged for hearings to be conducted in New York in order to meet the convenience of the parties and the numerous witnesses.

Extended hearings followed in the Southern District of New York. The court elicited testimony and received exhibits directed to the broad question of compensatory rentals and more especially on the precise matter of the importance of rentals to and the over-all costs

2. At the recent New York hearing the defendant submitted in evidence comments of some 127 canners which appeared on questionnaires previously presented to packers throughout the country by the government in its effort to ascertain the relationship of rental costs to total operation expenses. Ex. N.Y.-C U. S. v. Continental Can Co., Civ. 97–186. (Case transferred for this hearing. Re-transferred to Calif. at conclusion of hearing).

The most often repeated grievances voiced by small packers were the following: (1) It has been necessary to drop lines of production because receipts do not support rental increases of machinery; (2) service charges on purchased machines are too high for operators who are unable to employ own experts; (3) capital requirements for purchase of machinery imposed undue burdens on those with limited resources.

of small or seasonal canners. An answer was required on this question, together with the over-all effect of revised accounting techniques by defendant Continental, in order to determine whether the judgment should be left as is or, in the alternative, should be modified in the manner requested by Continental.

### The Issue.

As previously stated the issue to be resolved by the court is whether the retention of the compensatory rental provision contained in paragraph (10) of Section III is consistent with the aims of the decree, in view of the asserted prejudice to the packing industry, particularly to small canners.

At all of the hearings conducted on the question of compensatory rentals, American has claimed that it is compensatory within the contemplation of the foregoing section. The Government has contended that any modification, alteration or revision of the decree is unwarranted and would operate to create instability and unrest in the industry, particularly as to those canners who have purchased closing equipment on the faith of the provision in question.

The court is satisfied that the issue has degenerated into a war involving theories of accountants and accounting principles. Forgotten has become the underlying philosophy interwoven in the decree and the realistic approach to the problem which it calls for.

The evidence disclosed at the hearings conducted in New York that if Continental's proposed figures were to be projected into the year 1955 it would require a rental increase of approximately 250% over 1950 rentals.[3]

Mr. Cogan, the government agent, who examined and surveyed the books and is thoroughly conversant with the background of the litigation as well as the complex issues presently involved, concluded that Continental's projected figures, based upon their interpretation of the provision, are within the orbit of sound accounting practice.[3a]

Mr. Parnaby, an outstanding accountant of Haskins & Sells, employed by Continental to revise their methods and clarify the accounting problems, testified that he and a team of a dozen accountants worked four months in preparing the exhibits which eventuated and were finally submitted to the court during the course of the hearings conducted in New York.

He stated that Continental's projected figures were valid and would meet the requirements of sound accounting practice. With respect to American's principles of accounting, he said, in effect, he would neither criticize nor approve the same.[4]

Under such circumstances, although American and Continental are widely divergent on their respective interpretation under this particular provision of the decree, we find the expert accountants in accord, to the extent that the different accounting theories espoused by the companies have equal validity.

In an endeavor to rationalize on this contested provision, and in a fair attempt to bring about a solution within

---

3. (Ex. D.) With 1950 rentals constituting a base, the following percentage increases are reflected in the subsequent years:

| 1951 | 43% |
|------|------|
| 1952 | 74% |
| 1953 | 105% |
| 1954 | 149% |

The figure of 250% is a mean average of the record testimony of anticipated rental for 1955.

3a. (N.Y.Tr. p. 506: "A. The position I have taken is that it is a borderline case, and I think it is arguable one way or the other. Q. It is one of the difficult accounting problems in the case, is it not? A. Yes."

The court placed great reliance upon the extensive studies made by Mr. Cogan and his expert knowledge of the subject.

4. (Tr. p. 255, 1.4 to 1.7) ". . . I would have no hesitation in saying that in my opinion the accounting behavior of Continental is definitely better adapted than that of American to a continuing program of leasing and selling."

the confines and contemplation of the decree, it now appears that the interpretation of Continental, however valid from an accounting view, would create rental charges and costs disproportionate to any reasonable basis and in conflict with price levels obtaining generally in and under our present economy, mindful of the nature of the machines and their uses and purposes. In fact, some of the smaller or seasonal canners complained bitterly with respect to the projected rental program claiming that the rentals in some instances would not only be prohibitive and fantastic, but would require abandonment of business unless means could be found for purchasing closing machines. These marginal canners are entitled to consideration.

It was never within the contemplation of the decree to *compel* packers or canners to buy can closing machines rather than to rent. The testimony showed that some canners hesitate to purchase leased closing equipment because they might lose the benefit of new or improved types of closing equipment; other canners are reluctant to purchase because a change in their operations may require the use of different types or lesser numbers of closing machines; a third reason advanced by canners is the effect of the purchase obligation on the canners' working capital position. Others, of course, do not have sufficient credit standing to enable them to qualify as risks for instalment purchase. The court never intended to work an unconscionable or oppressive condition on any class of canner, large or small, particularly mindful of the marginal or seasonal canner.

Much has been written on the so-called "big case"—the anti-trust proceeding wherein the vast affairs of an industry are brought within the close scrutiny of a lone federal judge, sitting without assistance from a trained economist on his right hand and an expert accountant on his left. Mindful of the humility and natural limitations that usually attend members of the Federal judiciary one must approach the legal-economic problems of a great industry with judicial timidity and a careful regard for the interests of those whom the decree was designed to protect.

The court at the very threshold of the proceedings in forming the decree made statements that were somewhat prophetic of the questions now confronting the parties.[5]

The compensatory rental feature of the decree is subject to such varied and complex interpretations from an accounting viewpoint that it has now apparently become unworkable; not because of some intrinsic infirmity, but solely on account of the wide, varied and inconsistent constructions capable of being placed thereon by those skilled in the accounting field.

The underlying problem is not concerned with any abstract accounting principle or theory, and cannot be reduced to a mere exercise in the niceties of complex practices engaged in by expert technicians. The realities of the situation demand that if rentals are increased according to the projection advanced by Continental accountants, under their interpretation of the provisions of the decree, then such rentals will be so great

5. "The Court: You can establish rental values every year subject to the approval of the government. But what I have in mind is that Mr. (Seymour) has perceived, after careful study of this matter of rental with his staff, that the rentals will be so high according to your plan as to foreclose any possible desire on the part of the user, and if that be so, if that is the government's theory, they ought to expose it right now, because this is not a game I am playing here, and I do not intend to cross-examine lawyers about this thing. If that is the government's theory, I want to know about it, because I am not going to be a part. If that plan is to create a situation wherein the leasing value is to be so exorbitant as to defeat the purposes of the decree, I will just fold my hands.

"Mr. Jansen: Your Honor, I do not think the language contemplates anything like Your Honor expresses."

as to create an absurd and unconscionable result.

To the end that the position adopted by Continental may not be mistaken in the record, nor that unfair inferences be drawn, it should be observed that they have pressed their motion to modify the decree in the particulars mentioned in order to demonstrate that the provision in question, from their view, will work an economic hardship to the canner, particularly the small canner.

According to recent disclosures, as of September 1954 American had sold 83% of the original inventory of its can closing machines and Continental 74.5% under the compulsion of the decree. Rentals if increased to unrealistic levels would not give canners any real choice of determination between the acquisition by purchase, as compared to rental, but would result in *bludgeoning* them into purchasing a closing machine, whether desired or not. The decree was never designed to operate in such compulsive and arbitrary fashion.

The canners should, and in the very nature of things must, be accorded a fair opportunity and individual choice. Implied in any interpretation of rental values of can closing machines is the principle that the rental of the machine should be made at least as attractive as the sale, consistent with sound economic factors.

Recalling the original practices on leasing or renting which this court condemned,[6] such practices according to the disclosures made to this court have now been abandoned. Accordingly, rental values should be leveled off and set on such a basis as to be fair, reasonable and in accord with the dictates of a competitive economy.

This court does not assume to, nor should it, pass upon specific rental values of any given machine. These matters are peculiarly within the internal affairs of the respective companies, subject to the mandate of the judgment. It was never within the contemplation of the decree to constitute this court a public utility commission requiring constant and vigilant attention to the infinite details of rental values and levels.

Accordingly, and in view of the foregoing:

(a) The compensatory rental provisions of Section III, paragraph (10), shall be and they hereby are suspended, subject to the further order of the court.

(b) A form of order shall be prepared by Continental and approved by the Government as well as American. Such hearings shall be had in settling the order as may be necessary.

(c) In the preparation of said order consideration shall be given to the following: (1) That the base price of rental shall not be less than the 1953–54 rentals which shall serve as a floor; (2) that it shall not be more advantageous to lease than to purchase can closing machinery; (3) that rental charges shall be measured by units of machine use as a means of reducing charges for seasonal, occasional or small packers.

---

6. United States v. American Can Co., D. C., 87 F.Supp. 18, 27: "The devices took many forms; defendant provided discounts in ancillary contracts; defendant paid large sums of money to obtain business of its customers; *defendant furnished equipment, in addition to* *closing machines, at nominal rentals;* defendant paid large claims when it appeared propitious and good policy; defendant purchased canmaking equipment from its customers for inflated values in order to obtain can business."