Aaron BRAVMAN, Appellant,

v.

BASSETT FURNITURE INDUSTRIES, INC. and Bassett Mirror Co., Inc.

No. 76–1003.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1976.

Decided Feb. 16, 1977.

Rehearing Denied March 23, 1977.

Edwin P. Rome, Roger F. Cox, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for appellant.

J. Shane Creamer, Philadelphia, Pa., for appellee, Bassett Furniture Industries, Inc.

Ralph W. Brenner, Philadelphia, Pa., for appellee, Bassett Mirror Co., Inc.; Kent S. Bernard, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel.

Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from a final order of the district court granting the defendants' motion for directed verdicts in a suit in which plaintiff alleged violations of the federal antitrust laws and a state law claim for breach of contract. We reverse and remand for trial.

The case started as a diversity breach of contract action by Aaron Bravman, a furniture manufacturers' sales representative, against Bassett Furniture Industries, Inc. (Bassett Furniture), a furniture manufacturer. Bravman was granted leave to amend his complaint to include Bassett Mirror Co., Inc. (Bassett Mirror) as an additional defendant and to allege violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Bravman's claim under Section 3 of the Clayton Act was dismissed on a motion for summary judgment[1] and on November 11, 1975, a jury trial commenced with respect to the remaining claims. At the conclusion of Bravman's evidence the court granted defendants' motion for directed verdicts. No opinion was filed. Before proceeding to an examination of the evidence to determine whether the directed verdicts were properly granted a general outline of the relationships between the parties is appropriate.

Bravman is a furniture manufacturers' sales representative who solicits orders for the sale of furniture products of his client manufacturers to department stores, furniture stores, and buying offices. Bassett Furniture is a large manufacturer of wood residential furniture, including case goods and accessory tables.[2] Bassett Mirror is a manufacturer of mirrors, pictures, picture frames, space dividers, and similar items. Bassett Furniture and Bassett Mirror are separate corporations. According to a tendered but rejected offer of proof they have a number of common directors.

From June 1955 to May 1959 Bravman sold case goods for Bassett Furniture in an assigned area in eastern Pennsylvania. Under this relationship Bravman was not restricted from selling the products of other manufacturers, so long as those products were not directly competitive with Bassett's case goods. During this period Bravman sold products of other furniture manufacturers which were not competitive with Bassett's case goods, including upholstered furniture, chairs, and outdoor summer furniture.

In May 1959, Bassett Furniture reorganized its marketing methods and offered Bravman the opportunity to sell the products of its table division as well as its case goods, and to sell the products of Bassett Mirror. This offer contemplated that Bravman's assigned sales territory would be reduced, and that he agree not to represent any other furniture manufacturers. Bravman accepted the offer and terminated his relationships with all other furniture companies. The terms of this agreement were not reduced to writing and there was no discussion as to duration or termination. From 1959 to May 1970 Bravman represented Bassett Furniture and Bassett Mirror on an exclusive full-time basis. At that time Bravman was informed by Bassett Furniture that he no longer represented Bassett Furniture's line of table products or Bassett Mirror's line of products. Instead, he was to devote his time to the exclusive representation of Bassett Furniture selling case

---

1. The court granted defendants' motion for summary judgment in regard to the Clayton Act claim because it found that Bravman had never purchased or resold any of defendants' merchandise. See 15 U.S.C. § 14. Bravman has not appealed that ruling.

2. Case goods comprise residential bedroom and dining-room suites; accessory tables include, e. g., desk consoles, credences, wall units.

goods. Bravman protested, but eventually acquiesced and signed an acknowledgment agreeing to the changes. From May 1970 to September 1972, Bravman continued to sell Bassett's case goods. Bassett Furniture terminated the relationship in September 1972 because it discovered that shortly after Bravman lost the Bassett Furniture table line and the Bassett Mirror product line he undertook the representation of other furniture manufacturers selling furniture other than case goods. This lawsuit followed. In deciding whether the district court properly granted the directed verdicts against Bravman we must examine the evidence offered by Bravman to determine separately as to each cause of action alleged, "whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969) (collecting cases).

## I THE CONTRACT CLAIM

■ Bravman alleges that the contractual relationship between him and the defendants was one which would continue for a reasonable time which had not expired, and that the relationship was breached: (1) in May 1970 when Bassett Furniture withdrew its table line and Bassett Mirror withdrew its entire product line from his representation, and (2) when Bassett Furniture terminated the entire relationship in September 1972. The defendants contend that the relationship was terminable at will, and that even if it was not the September 29, 1972 termination was justified by Bravman's breach of contract in handling the lines of other furniture manufacturers. Bravman contends that Bassett Furniture waived the exclusive dealing requirement of their agreement by a course of conduct in which his allotment of Bassett Furniture case goods was reduced far below what he could normally sell were he to concentrate his sales efforts on selling Bassett case goods exclusively. In the absence of an opinion we do not know which of the defendants' contentions was relied on by the district court in granting the motion for directed

verdicts. On this record, however, neither ground suffices to justify a directed verdict in favor of either Bassett Furniture or Bassett Mirror.

All parties have argued the diversity contract claim on the assumption that Pennsylvania law governs. Both defendants and plaintiff urge that the appropriate Pennsylvania law with respect to the duration of their employment agreement is found in the cases dealing with employment contracts. Under Pennsylvania law an employment contract which contains no specific provision respecting duration or termination is presumed to be terminable at will unless the party asserting a contrary construction can offer evidence to rebut the presumption.

" 'The general rule is that when a contract provides that one party shall render service to another, or shall act as his agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will. . . . It is true that such a result does not follow in every instance, because it is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject matter of the agreement.' (Quoting *Slonaker v. P.G. Publishing Company,* 338 Pa. 292, 296, 13 A.2d 48, 50 (1940)).

The burden was, of course, upon the plaintiff, who was asserting to the contrary, to overcome the presumption that the contract was terminable at will. . . . This, he could do by proving the circumstances surrounding the execution of the contract, the situation of the parties, the objects they apparently had in view and the nature of the subject matter of the agreement from which the jury could infer that the contractual relationship contemplated by the agreement was

to endure for a reasonable time or for some particular period."

*Lubrecht v. Laurel Stripping Company,* 387 Pa. 393, 396, 127 A.2d 687, 689 (1956) (citations omitted); *accord, Cummings v. Kelling Nut Co.,* 368 Pa. 448, 451, 84 A.2d 323, 325 (1951); *Jackman v. Military Publications, Inc.,* 350 F.2d 383, 385 (3d Cir. 1965); *Mayerson v. Washington Manufacturing Co.,* 58 F.R.D. 377, 382–83 (E.D.Pa.1972). Besides recognizing that the presumption of "terminable at will" may be rebutted by evidence showing a contrary understanding by the contracting parties, the Pennsylvania cases also recognize that the presumption may be overcome by evidence showing that the plaintiff-employee gave the defendant-employer consideration in addition to the employee's normal services.[3] Upon a showing that an employee has rendered such additional consideration, e.g., sacrificing other employment opportunities, the duration of the employment contract is deemed to be for a reasonable period of time.

> "'It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined.'" . . . "'If the principal received for his promise to employ the agent considerations other than a mere promise by the agent to serve, and no time is specified by the terms of the agreement, the principal's promise is interpreted as a promise to employ the agent for a time which is reasonable in view of the purposes of the party giving the consideration.'"

*Cummings, supra,* 84 A.2d at 327 (quoting 4 Williston on Contracts (Rev.Ed.) § 1027–A (p. 2847 et seq.)); *see, e.g., Mayerson, supra,* 58 F.R.D. at 383; *Lucacher v. Kerson,* 158 Pa.Super. 437, 45 A.2d 245 (1946). Bravman argues that the evidence is sufficient to support a jury finding either that it was the express understanding of all of the parties to the agreement that the employment contract was not terminable at will, or that there was no express understanding, but Bravman gave defendants such additional consideration as made the duration of the employment agreement a reasonable period of time. We agree.

The evidence suggests that from 1955 to May of 1959, Bravman was an established furniture manufacturers' sales representative, whose representation included, but was not limited to, Bassett Furniture. By representing a number of furniture manufacturers Bravman was able to offer the customers on whom he called a full line of furniture. In consideration for his giving up the representation of other furniture manufacturers Bravman was granted the exclusive right to solicit orders for the Bassett Furniture table and case goods product lines, and for the Bassett Mirror product line. The evidence also established that during the employment relationship Bravman personally guaranteed to Bassett Furniture and Bassett Mirror the credit worthiness of many of the accounts from whom Bravman solicited orders. In 1969 Bassett Furniture insisted that Bravman hire, at his own expense, a full time associate to help cover Bravman's assigned territory. Between 1959 and 1969 Bravman turned down various opportunities to represent other furniture manufacturers. Bravman's only source of compensation for the effort expended in developing accounts in his assigned territory was commissions on orders which Bassett Furniture or Bassett Mirror

---

**3.** The defendants place great reliance on *Geary v. United States Steel Corporation,* 456 Pa. 171, 319 A.2d 174 (1974), for the proposition that unless an employment contract has a specific provision respecting duration or termination it is deemed terminable at will regardless of any evidence indicating otherwise. That case is not in point. *Geary, supra,* involves a tort action for plaintiff's wrongful discharge allegedly in retaliation for his having pointed out to his employer an unsafe condition in one of its products. The contract of employment in *Geary* was conceded to be terminable at will. The Supreme Court of Pennsylvania in a split decision declined to recognize a tort of unreasonable termination of an employment at will relationship. In the instant case there is a jury question as to whether the employment contract was terminable at will, and it involves principles of contract rather than tort law.

chose to accept. In May of 1970 Bravman was called to Bassett, Virginia and told that the Bassett Furniture table line was to be taken away from him, and that since it was customary for the salesmen who represent the Bassett table line to represent Bassett Mirror also, that line, too, was to be taken away. Bravman protested vigorously, contending the new arrangement was a breach of their undertaking. Despite the protest Bassett Furniture requested Bravman to sign a writing agreeing to these changes. The writing was on Bassett Furniture's letterhead, dated May 12, 1970, and reads:[4]

RECOMMENDATIONS FOR AARON BRAVMAN'S TERRITORY:

1. TABLE LINE will be separated and combined with Dankman's territory for new table man.

2. Bravman will maintain present associate.

This writing contains several signatures, including Bravman's. He testified that when he protested the termination of his representation of the Bassett Furniture table line and the Bassett Mirror product line, a representative of Bassett Furniture told him: "Please do me a favor and go in and sign this damn thing." To which he responded: "I will do it over strenuous objection." Bravman then signed the writing.

From this evidence the jury could have inferred the following: (1) that Bravman had between 1959 and 1970 furnished to defendants consideration in addition to his mere services, including the foregoing of representation of other manufacturers, the guaranty of credit of some accounts, and the services of an associate; (2) that in May of 1970 Bassett Furniture recognized that the relationship was not terminable at will when it insisted upon obtaining Bravman's signature on a writing acknowledging a change in the employment relationship; (3) that the writing Bravman was asked to sign made no reference to the duration of the relationship, and thus the prior arrangement was unchanged in this respect; i.e., it was still not terminable at will; and (4) that the writing Bravman was asked to sign

showed that he was to furnish consideration in addition to his mere services; namely, the continued services of an associate. Making these inferences, the jury could well have concluded that Bravman met his burden of overcoming the presumption that the employment relationship was terminable at will, and that the relationship was intended to continue for a reasonable period of time. Thus, we cannot sustain a directed verdict on the theory that the employment relationship was terminable at will.

Bassett Furniture contends that even assuming the relationship was not terminable at will it was justified in terminating it because Bravman breached the agreement in selling the products of other furniture manufacturers. This argument is without merit as a basis for supporting the directed verdict. It must be recalled that prior to 1959 Bravman sold Bassett Furniture case goods on a non-exclusive basis, that is, along with complementary but non-competing lines of furniture. The evidence suggests that between 1959 and 1970 the parties understood that Bravman's representation of Bassett Furniture and Bassett Mirror was to be exclusive. The evidence also suggests that during this period Bassett Furniture and Bassett Mirror were capable of filling the majority of the sale orders which Bravman could obtain while devoting his sales efforts to their exclusive representation. Bravman testified that in 1970 and 1971, after the removal of the table and mirror product lines, Bassett Furniture's ability to fill the sales orders for case goods which its sales representatives obtained was substantially impaired due to certain production and marketing conditions. As a result, Bassett Furniture rationed the supply of case goods which each sales representative was allowed to sell. Due to this rationing Bravman was able to sell his allotted quota with far less than full-time effort. He testified that the withdrawal of the table and mirror product lines, coupled with the shortage of supply of case goods resulted in a substantial curtailment of his income. The jury could well have inferred

4. Exhibit 86, App. at 668a.

from these circumstances that the parties intended the restoration of the pre-1959 relationship at least until Bassett Furniture was able to supply Bravman with enough case goods to justify a full-time sales effort. Alternatively, the jury could have found that since a full-time sales effort was no longer necessary to sell the allotted quota of case goods Bassett Furniture's insistence on enforcement of an exclusive sales relationship was for illegal purposes, and could not be relied upon as a defense to its own breach of contract.[5] Thus, Bassett's alternative theory cannot sustain a directed verdict. Bravman is entitled to a new trial on his breach of contract claim.

## II THE SHERMAN ACT CLAIMS

Bravman's amended complaint alleges that defendants conspired with each other, and other unknown parties, to engage in conduct which violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The amended complaint states in relevant part:

12. Because of the understanding and agreement imposed upon them by defendants, Bravman and other sales representatives were obliged to refrain from availing themselves of opportunities to represent other companies, including companies competing with defendants, and to represent defendants or other companies, including companies competing with defendants, in territories aside from those exclusive territories assigned to them by defendants.

13. As a result of defendants' imposition of the understanding and agreement upon Bravman and other sales representatives of defendants, competitors of defendants have been foreclosed from selling through Bravman and other sales representatives, who in turn have been foreclosed from distributing the products of

such companies, and retail dealers and other purchasers of residential furniture have been deprived of the benefits of free and open competition.

14. The effect of the understanding and agreement has been to restrain interstate trade or commerce and substantially to lessen competition or tend to create a monopoly in the sale of residential furniture.

The complaint also alleges that the defendants enforced the illegal restraints upon Bravman, and other sales representatives by threats of termination of their sales representative relationships, and that when defendants learned that Bravman was representing certain other furniture manufacturers, the defendants terminated their relationship with Bravman in furtherance of the conspiracy. As a result, Bravman claims to have suffered injury in his business or property within the meaning of Section 4 of the Clayton Act. 15 U.S.C. § 15.[6] The defendants contend: (A) that Bravman lacks standing to bring a private damage action under Section 4, and (B) even assuming that Bravman has standing, there is still no jury question as to the reasonableness of the alleged restraints.

### (A) *Bravman's § 4 Standing*

In a pretrial ruling on cross-motions for summary judgment on the Sherman Act claims the district court ruled:

"Defendants' motions for summary judgment insofar as Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 are concerned are denied. Plaintiff's motion for summary judgment on Count I [the antitrust claims] is denied, there exists a genuine issue of fact with respect to the reasonableness of the restrictive agreements imposed by the defendants." App. at 17a.

---

5.  See the discussion of the Sherman Act claim *infra.*

6.  Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in

any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Implicit in this ruling is the assumption that the amended complaint sufficiently alleges a cause of action which Bravman has standing to assert under Section 4 of the Clayton Act. After the denial of this motion the defendants made a new motion for summary judgment, directed specifically to Bravman's standing. This motion contended that since Bravman was a sales agent for, and not a "competitor" of, the defendants, he lacked standing to assert the alleged Sherman Act violations and to recover under § 4. This motion was denied without opinion. Because we do not have an opinion on the grant of the directed verdict we do not know for certain whether it was granted for lack of a prima facie violation, or for lack of standing. Considering the rulings on the successive motions for summary judgment, however, it seems most likely that the district court assumed Bravman's § 4 standing and granted the directed verdict on the ground that the tendered evidence failed to establish any Sherman Act violations. The defendants urge, nevertheless, that we should affirm on standing grounds. Defendants rely on

two theories, or perhaps two separate expressions of the same theory. First, they urge that under the Third Circuit cases only a competitor has standing to sue and recover under § 4. Secondly, they urge that under those cases an employee can never recover under § 4, and Bravman, they contend, must be so viewed.[7] Neither proposition is supported by the case law in this or any other circuit.

A literal reading of § 4 provides a cause of action to "any person" who is "injured in his business or property" by an antitrust violation.[8] Recognizing, however, that every antitrust violation may cause "ripples of injury"[9] far beyond the immediate parties directly affected by it, the courts have sought to narrow the scope of the remedy provided by § 4 by limiting the class of persons who have standing to sue under that statute.[10] In so doing, the courts have developed a standing doctrine "peculiar to antitrust actions."[11] These judicial attempts at defining what parties have § 4 standing have struggled for consistency with the policies underlying the substantive antitrust provisions[12] and the Congressional intention in enacting § 4.[13] Some courts

---

7. Though it is not determinative of Bravman's ability to recover under § 4, we note that his sales representative relationship with defendants seems more like an agency-principal relationship than an employee-employer relationship. Bravman was authorized to solicit orders on defendants' behalf from potential customers in a prescribed territory. Those orders were not binding on defendants until they formally accepted them. His compensation came solely from commissions on the orders defendants accepted and received payment for. He also paid all of his own expenses, including the expenses of the salesman he employed.

8. *See* 15 U.S.C. § 15.

9. *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

10. *See generally* Sherman, Antitrust Standing: From *Loeb* to *Malamud,* 51 N.Y.U.L.Rev. 374 (1976); Note, Application of the Data Processing Standard Test in Treble Damage Actions, 17 B.C.Ind. & Com.L.Rev. 489 (1976); Note, Standing to Sue for Treble Damages Under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570 (1964).

11. *Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1148 (6th Cir. 1975).

12. *See, e.g.,* Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. *See generally* Areeda, Antitrust Analysis 18–27 (1967).

13. The Supreme Court has recognized that Congress in providing for private treble damage actions under § 4 intended to establish a substantial deterrent against activities prohibited by the antitrust laws. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130–31, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Though the lower federal courts have also recognized this Congressional intent to have potential litigants serve as "private attorneys general", they have also been "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972) (collecting cases); *see, e.g., Cromar Company v. Nuclear Materials and Equipment Corp.,* 543 F.2d 501 (3d Cir. filed September 14, 1976); *Calderone Enterprises Corp. v. United Artists Theater Circuit, Inc.,* 454 F.2d 1292, 1295–96 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

have enunciated these limitations on § 4 standing under the rubric of "direct injury,"[14] others have used the expression "target area,"[15] and more recently one court has used the term "zone of interest."[16] The "direct injury" formulation originated in this Circuit in *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir. 1910), which held that the statutory predecessor of § 4[17] did not change the rule that an injury to the business or property of a corporation, even if the result of a Sherman Act violation, resulted in a claim belonging to the corporation, and not to its stockholders or creditors.[18] *Loeb* stands for the proposition that a restraint or conspiracy having a direct effect upon the business or property of a corporation provides no basis for recovery under § 4 by a stockholder or creditor of the injured corporation. That holding has been consistently followed in this Circuit. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 97 (3d Cir. 1976), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Ash v.*

*International Business Mach. Corp.*, 353 F.2d 491 (3d Cir. 1965), *cert. denied*, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966). These stockholder and creditor cases do not bear on Bravman's case, for in all of them the alleged impact of a restraint of trade was felt in the business or property of a corporation, and the injury, if any, to the plaintiffs consisted only in the diminution of the value of the injured corporation. The cited cases hold only that there is not a sufficient difference in kind between an antitrust tort and any other tort that § 4 should be interpreted as affording a cause of action which would not otherwise exist.

*Pitchford v. PEPI, Inc., supra,* also holds that an officer of a corporation lacks standing under § 4 to recover personal damages, in the form of lost income, as a result of an antitrust injury to the corporation. Defendants in the case *sub judice* rely on *PEPI, supra,* in support of their argument that Bravman has no standing to sue under § 4 because he is an employee of the defendants. This reliance is misplaced. Though the holding in *PEPI* extends the

---

14. *E.g., Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910); *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 729, 731 (10th Cir.), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Miley v. John Hancock Mut. Life Ins. Co.*, 148 F.Supp. 299, 302 (D.Mass.), aff'd per curiam, 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957).

15. *See, e.g., In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 129 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Calderone Enterprises Corp., supra; Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 689 (8th Cir. 1966); *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414, 418 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

16. *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1151 (6th Cir. 1975); *cf. State of Illinois v. Ampress Brick Company, Inc.*, 536 F.2d 1163 (7th Cir. 1976).

17. Section 7 of the Sherman Act, ch. 647, § 7, 26 Stat. 210 (1890).

18. The court in *Loeb, supra,* stated:

Prior to the statute [Section 7 of the Sherman Act (1890)], however, a stockholder in a corporation would have been without direct relief for an injury to his stock, through a wrong done to the corporation. The remedy for such an injury resided in the first instance, solely in the corporation. By means of such a suit it could have enforced the rights and redressed the wrongs of each of its stockholders. The statute above referred to was passed, as we must assume, with full knowledge of existing law in that respect. We have no reason to suppose, much less to assume, that it was intended thereby to run contrary to the settled policy of the law. . . . Moreover, it is manifest that the plaintiff did not receive any direct injury from the alleged illegal acts of the defendant. No conspiracy or combination against him as a stockholder or creditor is alleged. The injury complained of was directed at the corporation, and not the individual stockholder. Hence any injury which he, as a stockholder, received was indirect, remote, and consequential.

183 F. at 709.

"direct injury" rule of *Loeb* to deny standing to an officer of the injured corporation, the reasoning and policy considerations underlying the holdings in both *PEPI* and *Loeb* are identical. In *PEPI*, Judge Adams discussed employee-officer standing in essentially the same terms as were earlier used in *Loeb* with respect to stockholders and creditors. While any injury to a corporation might have the effect of reducing its ability to pay salaries, just as it reduced the interests of a corporation's stockholders and creditors, there was no reason to construe § 4 as creating a remedy for such reduction when none previously was known to the law. The corporation could pursue its own cause of action and thereby protect its stockholders, creditors, officers and employees. Contrary to defendants' assertions, *PEPI* is only a reaffirmation of the *Loeb* rationale and does not stand for any general proposition that employees never have standing under § 4.[19]

Two other cases in this Circuit, however, arguably fall outside of the consistent pattern running through *Loeb, Ash, Kauffman,* and *PEPI.* These are *Melrose Realty Co., Inc. v. Loew's,* 234 F.2d 518 (3d Cir.) (per curiam), *cert. denied,* 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), and *Harrison v. Paramount Pictures, Inc.,* 115 F.Supp. 312 (E.D.Pa.1953), *aff'd,* 211 F.2d 405 (3d Cir.) (per curiam), *cert. denied,* 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954). *Melrose, supra,* and *Harrison, supra,* stand for the proposition that a lessor of a motion picture theater, who receives as part of his rent a percentage of admission fees, has no standing under § 4 to sue his lessee for acts in violation of the antitrust laws, even though such acts have diminished the lessor's percentage rentals. Both *Melrose* and *Harrison* are per curiam opinions and neither opinion attempts to analyze the impact of the alleged restraints upon the revenue streams to which the lessors looked for their percentage rentals. Both opinions base their holdings entirely on the dictum contained in the district court opinion of Judge Kirkpatrick in *Harrison, supra.*[20] Judge Kirkpatrick states that on the facts of that case plaintiff's alleged injury is too "remote" to confer § 4 standing[21] but, he does not attempt to enunciate any general rule of § 4 standing.

It is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act and I shall not attempt to do so. Each case must be dealt with on its own facts.[22]

The defendants rely upon *Melrose* and *Harrison* for the proposition that this Circuit is committed to a "competitors only" limitation on § 4 standing. If that was the intention of this court when it issued its per curiam opinions in *Melrose* and *Harrison* it is a well concealed intention. Moreover, a general "competitors only" rule simply cannot be the law, since such a rule would bar

---

**19.** There is a substantial body of case law which recognizes that a party may have standing to sue under § 4 in the capacity of an employee. *See, e.g., Anderson v. Shipowner's Association,* 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926); *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *International Assn. of Heat and Frost Insulators and Asbestos Workers v. United Contractors Assn., Inc. of Pittsburgh, Pa.,* 483 F.2d 384 (3d Cir. 1973), *amended* 494 F.2d 1353 (3d Cir. 1974).

**20.** 115 F.Supp. 312 (E.D.Pa.1953). In *Harrison* a jury rendered a verdict for defendants and Judge Kirkpatrick's opinion was primarily addressed to the court's denial of plaintiff's motion for a judgment n.o.v. or a new trial. Judge Kirkpatrick admits that his discussion of the standing question is dictum.

In view of the verdict, it is not strictly necessary to the disposition of the plaintiff's motions to pass upon the point made by the defendants that the plaintiff is not a person "injured in his business or property" within the meaning of the antitrust laws and, therefore, is not entitled to maintain this action, regardless of what was shown as to the alleged unlawful conspiracy. However, I think that the defendants are entitled, in the event of an appeal, to have a ruling upon it. . . .

115 F.Supp. at 315.

**21.** *Id.* at 316–17.

**22.** *Id.* at 317.

§ 4 recovery by a victimized customer of a price fixing conspiracy.[23] In any event, such a construction of *Melrose* and *Harrison* was recently rejected by us in *Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d 501.[24] Whether *Melrose* and *Harrison* would be followed today in the precise situation they presented need not concern us. It is clear that they give no authoritative guidance for the standing of § 4 plaintiffs generally.

Thus, neither of the two "standing" rules which the defendants urged find support in the case law of this Circuit. It remains for determination whether we should in this case announce a rule which would exclude from § 4 recovery claims such as Bravman's.

We have not in this Circuit developed an extensive jurisprudence on § 4 standing. Aside from the seminal *Loeb* case and its direct progeny *PEPI, Kauffman,* and *Ash,* the most extended discussions are found in Judge Forman's opinion in *International Ass'n, etc. v. United Contractors, etc.,* 483 F.2d 384 (3d Cir. 1973), *amended* 494 F.2d 1353 (3d Cir. 1974), and in Judge Garth's opinion in *Cromar Company v. Nuclear Materials and Equipment Corp., supra.* In the former, Judge Forman declined to extend the *Loeb* rationale so as to deny § 4 standing to employees alleging injury resulting from the competitive disadvantages placed upon their employer by the challenged restraints.[25] In so holding, he gave approving reference to the Ninth Circuit's "target area"[26] rationale.

According to traditional theories of direct-indirect harm which have been applied by court decisions in order to limit the sweep of antitrust liability, the harm suffered by members of the Unions would be indirect, as they are adversely affected by the conspiracy directed against their employers, the non-Association contractors, not parties to the present suit. However, the "target" theory logically can encompass any claim of damage in the affected area.[27]

In *Cromar* Judge Garth declined the endorsement of any particular standing rubric in favor of a functional analysis.

Each case, therefore, must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether this plaintiff is one "whose protection is the fundamental purpose of the antitrust laws."[28]

We think Judge Garth's election to avoid labelling in favor of an examination of the factual matrix presented by each case in light of the policies underlying the antitrust laws is the more reasoned approach to § 4 standing. That approach recognizes that § 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems.

Examining such factors as Bravman's relationship to the defendants, his position in

**23.** The right of consumers to challenge price fixing conspiracies is well established. *See, e.g., In Re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir. 1974); *In Re Master Key Antitrust Litigation,* 528 F.2d 5 (2d Cir. 1975); *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**24.** The district court in *Cromar, supra,* held that this Circuit had adopted a "competitors only" standing test. 1975 Trade Cases ¶ 60,373 (M.D.Pa.1975).

**25.** *See* 483 F.2d at 397–98.

**26.** *See* note 15 *supra* ; *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955); *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

**27.** 483 F.2d at 397.

**28.** 543 F.2d at 506.

the area of the economy threatened by the alleged anticompetitive acts, the directness of his alleged injury and the Congressional policies underlying § 4,[29] we conclude that Bravman does have standing to assert his claims. Bravman complains of two restraints, the exclusive dealing requirement and the territorial limitation. Those restraints, according to the evidence, operated directly on him in three separate time periods. Between 1959 and 1970 they prevented him from representing other furniture manufacturers, and also from selling Bassett products in territories assigned to other manufacturers' sales representatives with whom he might have competed. Since the restraints operated directly upon him, the direct injury cases such as *Loeb* and its progeny would suggest by negative implication, that Bravman has § 4 standing.

Between May of 1970 and September of 1972 the restraints continued. During this period, however, Bravman was also subjected to the total withdrawal of Bassett Furniture's table products and Bassett Mirror's products, plus a drastic reduction in case goods. The attempt by Bassett Furniture to impose its exclusive representation policy upon Bravman in a period where such a restraint was seemingly unreasonable on its face lends more weight to Bravman's claim of § 4 standing. Such an attempt suggests not only that Bassett Furniture had substantial market power, but also exercised that power in a manner which may place unreasonable restraints on the distribution channels within the furniture industry. Allowing Bravman to act as a private attorney general in challenging conduct which directly restrains his ability to sell furniture products carries out both the policies behind § 4 and the substantive policies of the antitrust laws. .

In September of 1972 Bassett Furniture terminated its relationship with Bravman because of his breach of the restraints. Af-ter this termination Bravman's relationship with Bassett was no longer that of an agent-principal or employee-employer. Instead, Bravman was a direct competitor of the manufacturers' representatives who sold for Bassett Furniture and Bassett Mirror. Surely Bravman must be viewed during this period as a competitor within the so-called "target area" of the conspiracy. He was a party at whom the alleged restraints are directly aimed and who operates within "that area of the economy which is endangered by a breakdown of competitive conditions.[30] Though the alleged restraints were obviously aimed at enhancing the competitive position of the Bassett Companies vis-a-vis other furniture manufacturers they were also aimed at enhancing the competitive position of Bassett's sales representatives. For the period after September 1972 Bravman would seem to meet not only the "target area" test but also the "competitors only" standard asserted by defendants. Without basing our decision solely on any one of the above observations we find that Bravman's allegations when viewed in their totality are sufficient to confer standing under § 4.

The foregoing discussion has been couched in the language of restraint on, or conspiracy to restrain trade. But while we have used the vocabulary of Section 1 of the Sherman Act our analysis of the standing issue is not materially different for Bravman's claim under Section 2. Fairly read, Bravman's complaint alleges that defendants attempted to monopolize not only the manufacture but the distribution of furniture. While a § 2 attempt may involve an element of intent different from a § 1 conspiracy,[31] its effect upon persons in the channel of distribution to which it is directed will not differ. A manufacturers' sales representative is a part of that channel of distribution. Indeed, the defendants have drawn no distinction here, or in the district

---

**29.** *See* note 13 *supra.*

**30.** *Mulvey v. Samuel Goldwyn Prods.*, 433 F.2d 1073 (9th Cir. 1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); *see Calderone Enter. Corp., supra* ; note 15 *supra.*

**31.** *See* VonKalinowski, Antitrust Law and Trade Regulations, compare Section 6.01[3][a] *with* Section 9.01[4].

court, between § 4 Clayton Act standing for purposes of a § 1 or § 2 Sherman Act violation. Bravman has standing to assert his § 2 claim.

We conclude that the judgment appealed from cannot be affirmed on the ground that Bravman lacked standing to bring a § 4 Clayton Act damage action.

#### (B) *Bravman's Prima Facie Case*

■ Could a jury considering Bravman's evidence in the light most favorable to him have reasonably concluded that defendants violated §§ 1 and 2 of the Sherman Act? The sufficiency of the proffered evidence to establish a § 1 violation may best be examined by a step by step analysis of the essential substantive elements of that offense.

##### 1. *The existence of a restraint of trade*

The evidence we have referred to above established, and the defendants do not deny, that Bravman was restrained from handling the lines of other furniture manufacturers, and was confined to a specific sales territory.

##### 2. *The existence of a conspiracy in restraint of trade*

The admitted evidence was sufficient to support a jury finding that Bassett Furniture and Bassett Mirror acted in concert in imposing both restraints upon Bravman.[32] Bravman testified that the defendants held joint sales meetings semiannually and that these meetings were conducted jointly by representatives of Bassett Furniture and Bassett Mirror. Regarding these meetings Bravman testified:

> In each and every meeting that took place, it was continually asserted that sales representatives were to devote 100 percent of their energies, of their business energies to the selling of Bassett Furniture Products of the various lines that they represented, whether it be tables, and mirrors or Bassett Furniture Industries case goods, tables and mirror divisions. At the same meetings, it was also, to introduce the names where territories were changed, so that everyone was aware of the fact that changes were made by management, if they deemed it necessary.[33]

He also testified that it was defendants' joint policy that only those sales representatives who sold Bassett Furniture's table products could represent Bassett Mirror. Beyond question the jury could find that there was a conspiracy to impose the challenged restraints upon Bravman.

##### 3. *The reasonableness of the restraints*

Neither an exclusive dealing requirement[34] nor a territorial sales solicitation requirement[35] has ever been held by the Supreme Court to be a per se violation of the antitrust laws. The question, then, is whether a jury could have found either restraint to be unreasonable.[36] To state it another way, the question is whether both restraints when viewed in the circumstances of the case could be declared per se lawful.

---

**32.** Since Bassett Furniture and Bassett Mirror are separate corporations there is no intra enterprise conspiracy problem. *Compare Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094–95 n.1 (3d Cir. 1972) (per curiam).

**33.** App. at 178a.

**34.** *See, e. g., Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Standard Oil v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *United States v. American Can Co.*, 87 F.Supp. 18 (N.D.Cal.1949).

**35.** Cf. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Bravman urges that *Schwinn, supra*, establishes a rule of per se illegality in respect to all territorial restraints. *Schwinn* does not hold that territorial restraints on persons such as Bravman who are not purchasers for resale are per se illegal. *See Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 936 (3d Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

**36.** *See, e. g., Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246–48 (3d Cir. 1975).

The defendants urge that an employer can designate an employee's sales territory and the types of products to be sold. That position is arguable, and might well justify the affirmance of a jury verdict in their favor. There is, however, a substantial amount of evidence suggesting that Bravman's relationship with defendants was not one of employee-employer but rather one of agent-principal.[37]

Defendants argue that even if Bravman is found not to be an employee, the imposed restraints are still reasonable as they are justified by legitimate business practices. In examining the reasonableness of a restraint the standard in this Circuit "is not whether the defendant deployed the least restrictive alternative . . . [but] whether the restriction . . . is actually 'fairly necessary' in the circumstance of the particular case. . . ." *American Motor Inns, supra,* 521 F.2d at 1248–49. The evidence suggests that prior to 1959 Bravman handled other lines of furniture along with Bassett Furniture case goods. After May of 1970 he was again reduced to handling Bassett Furniture case goods, in reduced quantities, but he was not restored to his former freedom to represent other lines. From this the jury could have inferred that the exclusive dealing restraint was unreasonable, as it had little to do with the amount of time and effort required for adequate sales representation. There is no evidence in the record suggesting that the imposed restraints are reasonable as a matter of law.

At this point we are confronted with the district court's rulings on some proffered but rejected evidence. A delineation of the relevant product and geographic market, and the manner in which a challenged restraint operates in that market is essential to a rule of reason analysis.[38] Yet the district court excluded from the record the evidence tendered by Bravman to establish the relevant market and the effects of the restraints upon that market. This evidence involved the following offers of proof: defendants' size and profitability when compared with their competitors in the furniture industry; the opinion of a former salesperson that there was no legitimate business reason for the challenged restraints; Bravman's opinion as to what Bassett Furniture thought was a good performance by a sales representative; and the nature of the relationship between Bassett Furniture and Bassett Mirror in regard to common directors and officers. If we were to conclude that had all the above evidence been admitted no jury could find the restraints to be unreasonable we would consider the exclusion of this evidence to have been harmless.[39] We find, however, that had the proffered evidence been admitted, a jury could have found that Bassett Furniture, a comparative giant in the furniture manufacturing business, acting in concert with Bassett Mirror, imposed upon Bravman a restraint having no significant relationship to any legitimate business interest, but only an anti-competitive result. We are not persuaded by the district court's bench rulings in support of the exclusion of the above-mentioned evidence. The court erred in excluding this evidence. *See American Motor Inns, supra,* 521 F.2d at 1246–50; *Cromar, supra,* at 510–511. We find that the admitted and erroneously excluded evidence establish a prima facie case of a § 1 violation.

A Section 2 charge of attempt to monopolize requires a finding of "specific intent" to do so.[40] Such an intent may be inferred

---

**37.** *See* note 7 *supra.* Bravman characterizes himself as an "independent contractor."

**38.** *American Motor Inns, supra,* 521 F.2d at 1246–47; *see Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Travelers Ins. Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.) cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973).

**39.** *See Cromar, supra,* at 512–513 (Rosenn, J., dissenting in part).

**40.** *E. g., United States v. Columbia Steel Co.,* 334 U.S. 495, 532, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *United States v. Griffith,* 334 U.S. 100, 105–07, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

from circumstantial evidence.[41] Circumstantial evidence from which such intent may be inferred includes engaging in unlawful conduct [42] and specific intent to combine or conspire in such conduct.[43]

In his brief on appeal Bravman limits his Section 2 charge to the claim that defendants attempted to monopolize the sale of residential furniture within the territory assigned to him. An attempt to monopolize directed at a specific geographic area falls within § 2.[44] We have held above that the jury could have found a conspiracy in violation of Section 1. There is, however, no evidence suggesting a sufficient nexus between the possibly illegal restraint on Bravman's services and the exclusion of other furniture manufacturers from his territory to support a jury finding of specific intent to monopolize furniture sales in that territory.

We conclude that the directed verdict dismissing Bravman's § 1 Sherman Act claim must be reversed, but that the dismissal of the § 2 Sherman Act claim was proper.

### (C) *Bassett Mirror's Statute of Limitations Defense*

▮ Bassett Mirror contends that under § 4B of the Clayton Act, 15 U.S.C. § 15b,[45] any antitrust claim against it is time barred. That statute provides that any action under § 4 of the Clayton Act not commenced within four years of the accrual of the cause of action shall be forever barred. Bassett Mirror points out that the

last time it did business with Bravman was in May of 1970, and that this suit was not filed until August 28, 1974. This contention misses the point. The jury could find that the exclusive dealing restraint which continued thereafter was for Bassett Mirror's benefit as a direct result of continued concerted action by the defendants. The termination of Bravman's relationship with Bassett Furniture did not take place until September 1972. Clearly the complaint is within the statute of limitations as to Bassett Furniture. If the jury finds that the restraint is unlawful and that the two defendants were acting in concert in continuing it, Bassett Mirror will share equal liability with Bassett Furniture for any injurious acts committed within the statutory period. *See Grunewald v. United States*, 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

### III CONCLUSION

The judgment of the district court will be reversed and the case remanded to the district court for a new trial on Bravman's diversity contract claim and his claim under Section 1 of the Sherman Act, but affirmed insofar as it granted a directed verdict on the Section 2 Sherman Act claim.

SEITZ, Chief Judge, *concurring and dissenting,* in part.

I join in the judgment and opinion of the court as to the contract claim, and agree that Bravman has standing under § 4 of the

---

**41.** *See, e. g., Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 224–27, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Eastern States Retail Lumber Dealers Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

**42.** *See, e. g., United States v. Griffith,* supra, 334 U.S. at 105–09, 68 S.Ct. 941; *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *United States v. Crescent Amusement Co.*, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944).

**43.** *United States v. Singer Mfg. Co.*, 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

**44.** *See, e. g., United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

**45.** 15 U.S.C. § 15b provides:

Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections.

Clayton Act, 15 U.S.C. § 15, to litigate his § 1 and § 2 Sherman Act claims. I also join in that portion of the opinion dismissing the § 2 claims. I dissent, however, from the disposition of the § 1 claim, because I think that Bravman failed to produce sufficient evidence from which a jury could reasonably find that defendants have imposed an illegal restraint of trade upon Bravman. I also feel that the majority errs in deciding the statute of limitations issue since in the present posture of the case it is more appropriate to remand that issue to the district court.

Bassett Furniture and Bassett Mirror (hereinafter collectively referred to as Bassett) manufacture furniture products which are distributed directly to independent non-franchised retailers. They utilize sales representatives, such as Bravman, to demonstrate their product line to retailers and solicit orders from them. Bassett extends credit and invoices the retailer and ships the furniture directly to the retailer, paying the sales representative a commission on each sale. The sales representatives often guarantee payment on behalf of retailers whom Bassett regarded as unacceptable credit risks; Bravman found it necessary to guarantee payment for between 25 and 30% of his dollar volume in most years, and was forced to effect collection and sometimes incurred losses on delinquent accounts guaranteed by him.

Bravman has challenged two distribution practices of the Bassett companies: the exclusive dealing requirement under which Bassett sales representatives are contractually restricted from selling the merchandise of any other company while representing Bassett, and a policy restricting Bassett sales representatives from selling outside of the exclusive sales territory assigned to them. Bravman asserts that he is engaged in an independent distribution business, that these practices restrain him in his business, and that since they were imposed at a time when his sales efforts were being underutilized by Bassett, the restraints are patently unreasonable. Moreover, he contends that they were intended to and/or had the effect of restraining trade by preventing competing manufacturers access to his services and hence to retail outlets.

Before the legality of these practices is appraised, it seems appropriate to elaborate my reasons for agreeing with the majority that the jury could find that Bravman was an independent contractor and not an employee or agent. It is undisputed in the record that Bassett did not make social security contributions on behalf of Bravman, that it did not provide him with office space, that it did not pay benefits to him, that Bravman guaranteed payment on certain accounts and was responsible for damaged or unaccepted merchandise, and that Bravman, at Bassett's direction, hired an associate to help service accounts in his territory and that the associate was employed and compensated by Bravman. Moreover, an internal memorandum from the chairman of the board of Bassett Furniture describes sales representatives as independent contractors (app. at 623–24). On the other hand, it is undisputed that Bravman solicited sales in Bassett's name, not his own, that the companies accepted or rejected orders placed by Bravman, and that Bravman did not insure goods. Although this evidence is somewhat mixed, I think that, at the least, it created a jury issue as to plaintiff's status.

## I. EXCLUSIVE DEALING REQUIREMENT

At least on appeal, it is not contended that the exclusive dealing arrangement is governed by § 3 of the Clayton Act. Consequently, the more general proscription of § 1 of the Sherman Act must furnish the guide for decision, and it is clear that that Act does not render exclusive dealing contracts unreasonable *per se*. *See, e. g., American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1248–53 (3d Cir. 1975). *See also FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953).

A. *"Common Law" Unreasonable Restrictive Covenant*

Plaintiff vigorously argues that the Sherman Act codified the preexisting common law doctrine under which any restriction is unreasonable which, absent dominant social or economic justification, is greater than required for the person for whose benefit it is imposed, or "imposes an undue hardship upon the person restricted." *Restatement of Contracts* § 515 (1932). He argues that since Bassett was unable to fill his orders for merchandise sold, there was no business justification for maintaining the restriction, and that since the restriction was therefore greater than necessary to protect its interests, and imposed undue hardship upon Bravman in his business, Bassett violated § 1.

At least since *Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), it has been clear that the fundamental purpose of the Sherman Act is the preservation of competition and the central inquiry in a rule of reason analysis is the extent to which the challenged practice dampens competition. It is hardly sufficient for plaintiff to show that he has been restrained in his business and that but for the restraint he could have earned more money. As Justice Brandeis noted:

> Every agreement concerning trade, every regulation of trade restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. *Id.* at 238, 38 S.Ct. at 244.

Implicit in plaintiff's argument is the idea that proof of market impact is not necessary when no business justification has been shown and the viability of an independent economic unit is implicated by the challenged practice. *See* Bok, "The Tampa Electric Case and the Problem of Exclusive Arrangements Under the Clayton Act," 1961 *Sup.Ct.Rev.* 267, 293–95 (P. Kurland ed. 1961). But this is not a situation in which an independent dealer, having invested in the establishment of a market outlet, is threatened with extinction. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). *See also Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1347 (3d Cir. 1975). Although a manufacturer cannot claim that the practice challenged here enjoys the virtues of a requirements contract, which quite often benefits the buyer as well as the seller, we know too little about the need for the practice from the standpoint of economic efficiency in the orderly distribution of goods to permit its condemnation without an analysis of its market impact. It was therefore incumbent upon plaintiff to introduce evidence concerning the foreclosure of retail markets to Bassett's competitors.

B. *Foreclosure of Retail Markets*

Plaintiff has urged that the exclusive dealing restriction has the purpose and/or effect of preventing competing manufacturers from reaching retail outlets. If this were the case, interbrand competition among furniture manufacturers might be adversely affected and the exclusive dealing requirement would bear close scrutiny. To prove this charge, it was incumbent upon plaintiff to show that defendants conspired or acted with the purpose of achieving this end, or that the restriction, though innocently conceived, actually tended to or did accomplish that result. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Columbia Steel Co.,* 334 U.S. 495, 522, 525, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Plaintiff introduced no evidence that manufacturers actually encountered difficulty in reaching retail outlets, but did attempt to show that the restriction tended toward this result and that defendants conspired to foreclose competitors access to retail markets.

1. *Tendency to foreclose retail markets.*

As evidence of an anticompetitive tendency, plaintiff attempted to show that Bassett Furniture is one of the two largest wood household furniture manufacturers in

an otherwise fragmented industry. While Bassett Furniture had 5,000 employees, 87% of such manufacturers had fewer than 100 employees. Bassett Mirror, which shared Bassett Furniture's table line sales representative, had 140 employees but could not support its own sales organization. From these facts it is asserted that a jury could conclude that if Bravman's sales services were monopolized by Bassett, other companies could not distribute their products. The question for decision is whether this evidence is sufficient to permit the issue to go to the jury.

Bassett apparently does not sell through franchised retail outlets or restrict the retailers upon whom its distributors may call. Therefore, this case does not involve a situation in which small competing manufacturers would be faced with the cost of integrating forward if a dominant firm were to tie up a number of existing retail outlets. *See FTC v. Brown Shoe Co.,* 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966). Obviously, the nonavailability of plaintiff's services to other manufacturers will necessitate their having to find other distributors in order to supply retailers with their products. But Bravman has not shown that he maintains a warehouse or showroom, that he made any capital investment, in short that he offered anything other than his services as a skilled salesman. Since Bravman's position in the distribution system, both before and during his association with Bassett, was functionally that of an employee-salesman, rather than a jobber or wholesaler, I think that the assertion that a distribution bottleneck would occur if Bravman's services were unavailable to other manufacturers is wholly speculative. Under these circumstances, I think that it was incumbent upon plaintiff to introduce evidence of the relevant market, Bassett's position in that market *vis a vis* its competitors, the structure of the industry and the distribution practices common in the industry.

Plaintiff failed to introduce or proffer any evidence on most of these points. The proffered evidence of the structure of the industry and Bassett's size and profitability, while relevant, is insufficient to permit a reasoned evaluation of market foreclosure. For example, assuming the accuracy of Bassett Furniture's representation that it enjoyed only 3% of the market, could not the manufacturers who held the remaining 97% of the market distribute their products through sales agents retained on a nonexclusive basis? Did the competing manufacturers have access to and utilize jobbers or wholesalers? Did other large firms employ exclusive dealing restrictions? Plaintiff has failed to provide evidence from which these questions can be answered.

Plaintiff has also urged that any purported interest which defendants have in maintaining dealer loyalty and efficiency could not justify the exclusive dealing requirement since the less restrictive alternative of establishing a sales quota system for dealers would achieve the same goals. Had plaintiff adduced some evidence of an anticompetitive tendency, he would be entitled to have the trier of fact consider the evidence on this point. But the law of this circuit is that absent any showing of an anticompetitive tendency attributable to the challenged practice, the existence of a less restrictive alternative will not by itself establish the unreasonableness of the practice. *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1246–49 (3d Cir. 1975).

2. *Conspiracy to foreclose retail markets.*

Bravman has also attempted to show that Bassett Furniture and Mirror conspired or acted with the purpose of impeding the sales of its competitors. I agree with the majority that plaintiff adduced sufficient evidence of the fact of agreement to impose the exclusive dealing restriction on dealers to reach the jury on that element. Their only evidence of an unlawful purpose is that the exclusive dealing restriction was not relaxed during a period in which Bassett was unable to fill Bravman's orders. It is argued that, at least while Bassett was underutilizing Bravman's services, there was no conceivable business purpose justify-

ing the restriction; therefore the jury could infer a wrongful purpose to deprive competing manufacturers of access to retail outlets.

I agree that a wrongful purpose may be inferred from circumstantial evidence. *See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (conspiracy among retailer and suppliers to boycott rival retailer); *Lorain Journal v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (refusal of newspaper to accept advertising unless buyer forebore from advertising with competitor). But a desire to maintain an exclusive sales force cannot, on its face, be equated with the predatory nature of boycotting, blacklisting, or other coercive tactics. This exclusive dealing requirement, on its face, manifests the normal business purpose of facilitating the orderly distribution of goods by having sales representatives devote their full-time efforts to intensive promotion of the full line of Bassett products assigned to them. Absent some showing that the practice involved here would actually tend to impede competitors access to retail markets, I think it is impermissible as a matter of law to permit the trier of fact to infer that the practice was actually established or maintained for that purpose. *Cf. Times-Picayune, supra,* 345 U.S. at 622–24, 73 S.Ct. 872; *Gold Fuel Service, Inc. v. Esso Standard Oil Co.,* 306 F.2d 61 (3d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963).

## II. VERTICAL DIVISION OF TERRITORIES

In *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court held that a vertically mandated territorial restriction is unreasonable *per se* when imposed upon buyers, but that the restriction is subject to the rule of reason when imposed upon dealers functioning as agents or consignees who assume neither title, dominion, nor risk of loss over the goods sold. I agree with the district court that the fact that Bravman guaranteed payment on certain accounts did not

alter the basic arrangement as one in which the manufacturer retained title, dominion and risk of loss over the products which Bravman sold to retailers. It is clear, therefore, that the vertically imposed territorial restriction which Bravman challenges is not illegal *per se.*

In *Schwinn,* the retail dealers selling under the "Schwinn plan," received shipments directly from Schwinn and were invoiced by and made payments to Schwinn. Schwinn established the price at which the retailer would purchase and remitted a standard commission to the sales representative in whose territory the order originated. 237 F.Supp. 323, 340 (N.D.Ill.1965). Thus, in *Schwinn,* as in this case, there was no intrabrand price competition at the *wholesale* level, not by virtue of the territorial restriction, but simply because the manufacturer established the wholesale price. In *Schwinn,* however, the territorial restriction was an integral part of a system through which Schwinn confined sales to franchised retail outlets—the result of which was to restrain intrabrand competition at the *retail* level. The Court recognized that this diminution of intrabrand competition could violate § 1, but, on the facts of that case, found it not unreasonable in light of the marketing system's overall procompetitive effect on interbrand competition.

Unlike Schwinn, Bassett does not franchise or otherwise limit retail outlets. Thus, Bassett's system cannot conceivably affect intrabrand competition at the retail level, and, as we have seen, cannot affect intrabrand price competition at the wholesale level. Theoretically, the territorial restriction could affect intrabrand nonprice competition at the wholesale level, but there has been no evidence or argument that nonprice competition among sales representatives is an important factor in the industry. Indeed, I have searched the record and briefs in vain to find even a single reference to a real or imagined anticompetitive effect attributable to the territorial restriction. Under these circumstances there is no need to examine procompetitive

aspects, for plaintiff's case has not progressed beyond the pleadings.

### III. STATUTE OF LIMITATIONS

Since the disposition of the majority will result in a new trial on the § 1 claim, and since we have not had the benefit of a district court ruling on this point, I would remand for consideration by the district court.